`BEYER v. LeFEVRE.

APPEAL FROM THE COURT OF APPEALS OF THE DISTRICT OF
COLUMBIA.

No. 237. Argued April 25, 28, 1902.—Decided May 19, 1902.

The agreement of parties to submit questions to a jury, the trial there, and
a stipulation for returning the testimony for consideration is a waiver of
objection to jurisdiction.

When the trial court and the appellate court agree as to the facts estab-
lished, this court accepts their conclusion.

Under the facts in this case the jury were not warranted in finding that
the execution of the will was procured by fraud or undue influence.

It is the rule of the Federal courts that the will of a person found to be
possessed of sound mind and memory, is not to be set aside on evidence
tending to show only a possibility or suspicion of undue influence.

THIS was a bill filed in the Supreme Court of this District on
April 7, 1899, to set aside the following will:

"In the name of God, Amen.

"I Mary Beyer of the city and county of Washington and
District of Columbia being now of sound and disposing mind,
do make, ordain, publish and declare this to be my last will and
testament: That is to say, first after all my lawful debts are
paid and discharged the residue of my estate, real and personal
I give, devise, bequeath, and dispose of as follows: to wit all
the furniture and personal effects now in the home, number 2258
Brightwood avenue I desire to remain there during the life of
my husband Louis Beyer or so long as it remains the family
home and in the event of the house not being retained as a
family home then the furniture and all other personal effects
belonging to me are to go to and belong to my nephew and
adopted son born Charles Lewis Smith but adopted by me at
birth and thereafter always called Louis Beyer, Junior.

"To my sister Elizabeth Kersinski Maus of Philadelphia Pa.
I leave five dollars.

"To my sister Caroline Kersinski LeFevre of Brookland D. C.
I leave five dollars.

" To my niece Helen J. Fenton of Washington, D. C., I leave five dollars.

" All the rest and residue of my estate, real, personal and mixed, of which I may die seized or possessed, whatsoever and wheresoever, of what kind, nature and quality soever the same may be, and not hereinabove given or disposed of, I hereby give, devise and bequeath, unto my nephew and adopted son, Louis Beyer, Junior, and Helen B. Johnson my niece in equal shares, as tenants in common and not as joint tenants, their heirs and assigns, absolutely and forever.

" Having full faith and confidence in the honesty, integrity and affection of my said adopted son and of my said niece, I leave them all the property stated herein knowing that they will provide a home and home comforts for Louis Beyer, Senior during his natural life but this is not to be construed to mean that said Louis Beyer, Junior and Helen B. Johnson are to be restricted from disposing of any or all of the property if their judgment so dictates but in the event of disposing of all of the property before the death of Louis Beyer, Senior they are to always maintain a home and home comforts for my beloved husband, Louis Beyer, Senior.

" Likewise I make, constitute, and appoint, my adopted son born Charles Lewis Smith but always known as Louis Beyer, Junior to be executor of this my last will and testament, hereby revoking all former wills made by me and I request that he be not required to give bond as such executor.

" In witness whereof I have hereunto set my hand, subscribed my name and affixed my seal this fourteenth day of July in the year of our Lord one thousand eight hundred and ninety-six in my home at Washington, D. C.

" MARY BEYER. [SEAL.]

" The above-written instrument was subscribed by the said Mary Beyer in our presence and acknowledged by her to each of us, and she at the same time published and declared the above instrument so subscribed to be her last will and testament, and we at the testator's request and in her presence and in the presence of each other have signed our names as wit-

nesses hereto and written opposite our names our respective places of residence.

"P. J. BRENNAN,
"1418 F St. N. W., Washington, D. C.
"WADE H. ATKINSON,
"707 12th St. N. W., Washington, D. C.
"THOMAS C. SMITH,
"1133 12th St. N. W., Washington, D. C."

The parties named as defendants were Louis Beyer, the husband of the testatrix; Louis Beyer, Junior, a nephew; Helen B. Johnson, a niece; Louis Beyer, Junior, as executor, and Meyer Cohen and Adolph G. Wolf, trustees in a deed of trust executed by the husband of the testatrix on May 13, 1897. The ground of attack was the alleged mental incapacity of the testatrix and undue influence on the part of Louis Beyer, Junior, and Helen B. Johnson. The personal property belonging to the testatrix was of little value, but she owned certain real estate, subject to a trust deed, which in the bill was alleged to be of the value of $25,000 over and above the incumbrance. Louis Beyer, Junior, and Helen B. Johnson, answering separately, denied mental unsoundness and undue influence; alleged that the will was duly executed, and challenged the jurisdiction of the court, sitting as a court of equity, to entertain the bill. The trustees pleaded that the bill stated nothing entitling the complainant to relief in equity, and averred that their deed of trust was a valid lien. Louis Beyer demurred generally. On June 20, the court having made no ruling upon the question of jurisdiction, the parties signed this stipulation:

"It is hereby stipulated by and between the parties to this cause this 20th day of June, 1899, that the court may make an order certifying certain issues, to be named in said order, to be tried by a jury of the Circuit Court, and that the findings by said jury upon said issues shall be returned to this court; whereupon a decree shall be entered in accordance with said findings, all rights of appeal as in cases of issues from the orphans' court being hereby reserved."

And thereupon the court made this order:

" Ordered by the court this 20th day of June, 1899, (the parties to this cause consenting hereto,) that the following issues to be tried by a jury be, and they hereby are, certified to the Circuit Court to wit:

" First. Was the said Mary Beyer at the time of the alleged execution of the paper-writing bearing date the 14th day of July; A. D. 1896, and purporting to be her last will and testament, of sound and disposing mind, memory and understanding and capable of executing a valid deed or contract?

" Second. Was the execution of the said paper-writing bearing date the 14th day of July, 1896, and purporting to be the last will and testament of the said Mary Beyer, procured by fraud, circumvention or undue influence practiced or exercised upon the said Mary Beyer by Louis Beyer, Jr., Helen B. Johnson, or by either of them or by any other person?

" Third. Were the contents of the paper-writing bearing date July 14th, 1896, and purporting to be the last will and testament of said Mary Beyer, known to her at the time of the alleged execution thereof? "

This order was assented to by all the parties. In pursuance thereof the case came on for trial before Mr. Justice Cole and a jury, and the jury, after hearing the testimony and the instructions of the court, answered each of the questions in the affirmative. A motion for a new trial was overruled by the presiding judge. A stipulation was entered into by the parties that the full report of the testimony and proceedings had before Mr. Justice Cole and the jury should be produced, read and heard by the equity court as a part of the record on the hearing in that court and in the appellate court to which the cause might be carried by either or any of the parties. Thereupon a full report of the proceedings was presented to Mr. Justice Barnard, holding the equity court, who, on May 14, 1900, filed an opinion sustaining the verdict of the jury, and directing a decree in accordance with the prayers of the bill. From that decree Louis Beyer, Louis Beyer, Junior, and Helen B. Johnson appealed to the Court of Appeals. On December 6, 1900, the Court of Appeals affirmed the decree. From that decree Louis Beyer, a severance being had, appealed to this court.

*Mr. Henry E. Davis* and *Mr. Franklin H. Mackey* for appellant.

*Mr. Clayton E. Ewing* and *Mr. Charles Poe* for appellee.

MR. JUSTICE BREWER, after making the above statement, delivered the opinion of the court.

The appellant contends, first, that the Supreme Court of the District, sitting as a court of equity, had no jurisdiction of this cause ; second, that the verdict of the jury was not sustained by the evidence ; and, third, that there was duress and coercion of the jury by the court, which resulted in an unjust verdict.

We pass the first question with the observation that, whatever might have been the conclusion if the defendants had stood upon their challenge of the jurisdiction, the agreement of the parties to submit certain questions to a jury, the trial before the jury and the stipulation for returning the testimony there taken to the equity court for consideration by the judge thereof, must be held a waiver of the objection to the jurisdiction. Under the Federal system the same judge may preside whether the court is sitting in equity or as a common law court. While the pleadings and procedure are dissimilar and the rights of the parties, especially in respect to juries, are different, yet in many cases a party who appears in one branch of the court and consents to a hearing and adjudication, according to the practice there prevailing, of an issue presented by the pleadings and in respect to a subject-matter, which is within the general scope of its jurisdiction, may be estopped from thereafter and in an appellate court challenging such jurisdiction. *Reynes* v. *Dumont*, 130 U. S. 354, 395. This is such a case. The determination of the title to real estate is within the scope of the general jurisdiction of a court of equity. The issue of undue influence in respect to any transaction such a court is competent to determine. The proceeding consented to, and in fact had, was practically the trial of a feigned issue out of chancery. It is too late now to raise the question of jurisdiction.

Passing to the second question, we premise by saying that

it is well settled that when the trial and the appellate courts agree as to the facts established on the trial, this court will accept their conclusion and not attempt to weigh conflicting testimony. *Stuart* v. *Hayden*, 169 U. S. 1, 14, and authorities cited in the opinion. And this rule of concurrence with the conclusions of the trial and appellate courts is given more weight when in the first instance the facts are found by a master or a jury. *Furrer* v. *Ferris*, 145 U. S. 132, and cases cited in the opinion. These propositions we have often affirmed. At the same time there has always been recognized the right and the duty of this court to examine the record, and if it finds that the conclusions are wholly unwarranted by the testimony it will set the verdict or report aside and direct a reexamination. And after having carefully examined the record in this case we are constrained to the conclusion that there is no testimony which justified the answer returned to the second question. On the contrary, if a will is set aside upon such a flimsy showing as was made of undue influence, few wills can hope to stand.

The facts are these : The testatrix was a woman sixty-five years of age ; had been married forty-five years, but was childless ; her relations with her husband and sisters were pleasant ; her near relatives were two sisters, Caroline LeFevre, the present appellee, and Mrs. Maus, the mother of Helen B. Johnson. Another sister had died many years ago, leaving two children, Charles Lewis Smith (known in the record as Louis Beyer, Junior) and Helen C. Fenton. Louis Beyer, Junior, while a little child, and on the death of his mother, was taken by the testatrix and brought up as her son. There does not appear to have been any formal adoption, but he went by the name of Louis Beyer, Junior, and was recognized and treated as her son. He was twenty-seven years old at the time of her death. Helen B. Johnson was, as stated, the daughter of Mrs. Maus, a sister of testatrix. She, too, lived with the testatrix the most of her life, although it does not appear that she had been recognized as a daughter. The testatrix died of cancer in the abdomen. The first indications of trouble were in December, 1893, though at that time the appearances were of an ordinary

case of indigestion, and the fact that it was cancer was not developed until some time in the early part of 1896, the year in which she died.   In the month of June of that year she went on a visit to the home of Helen Johnson's mother-in-law, twelve miles south of Richmond.   She returned about the first of July, was about the house for a week or so after her return, and then took to her bed, dying on July 26.   When spoken to, at different times prior to her visit to Richmond, about making a will she had declined, saying she intended the property should go to her husband; but being advised, either before or after her visit to Richmond, that in case she died without a will the property would go to her sisters and their descendants, she decided to have a will made, and so informed Louis Beyer, Junior, on Sunday, July 12; she also inquired if a will made on Sunday was valid, and was told by him, after an examination of a cyclopaedia, that it would be.   He suggested an attorney living near, to whom she objected, whereupon he proposed to call in Mr. Brennan, who occupied an office in the same building in which he was employed.   This was satisfactory.   Mr. Brennan was sent for.   Witnesses were asked to attend, among them her regular physician.   Mr. Brennan came in the afternoon, found her lying in bed, received instructions from her how she wanted the will drawn, and wrote it then and there.   It was thereafter read to her, signed and acknowledged by her in the presence of himself, the regular physician, and a Mr. Sullivan, and signed by them as witnesses.   That will was similar to the one finally executed, except that it devised the property to Louis Beyer, Junior, alone.   Mr. Brennan took the will to his office.   On examination he found that he had left out the word "heirs," so that, as he thought, only a life estate would pass to the devisee, and on Monday prepared a new will, exactly like the one which had been executed, with the addition of the word "heirs."   He called on the testatrix and explained the change he had made; she then said that, inasmuch as there had to be a new will executed, she would like to have Mrs. Johnson included with Louis Beyer, Junior.   Whereupon Mr. Brennan went to his office and wrote a will the third time, and on Tuesday went back to the house, and there it was executed.

That is the will in dispute. It was taken by him to his office and kept in his hands until after her death. That the contents of this will were known to her at the time of its execution, and that she was "of sound and disposing mind, memory and understanding, and capable of executing a valid deed or contract," were found by the jury, and were abundantly proved by the testimony, among the witnesses thereto being her regular physician, the minister who visited her, the lawyer who drafted the will, and others wholly disinterested.

Before noticing what is claimed to be evidence of undue influence, we remark that the will was not an unnatural one for the testatrix to make. As long as she supposed her husband would inherit the real estate, she declined to make any. She meant that he should have the benefit of the property. She found, however, that it was necessary for her to make a will in order to secure this result. He was an old man, and in the natural course of events could not be expected to live many years. It is not strange that, with the utmost affection for her sisters, she should prefer that, after he had had the enjoyment of her property, it should go to the nephew and niece who had made their home with her, who had been brought up by her, and one of whom, at least, was regarded as an adopted child. So she makes a will vesting the fee in them, but charged with the duty of furnishing a home to her husband as long as he lived, and relying upon their affection to give to him the comforts of a home such as they all had had together in the past. While she gave them the power of alienation, she coupled with it the proviso that whatever was done with this property they should still secure a home to him during his lifetime. She trusted much to their affection, but is this singular considering the length of time they had been members of her family and that which she must have known to be the relation subsisting between them and him? Yet she did not leave provision for her husband entirely to their affection. She directed in terms that such provision should be made, and she doubtless believed that that direction would be binding, and it was binding. It was in the nature of a precatory trust, and so expressed as to be obligatory upon the devisees and enforcible in the courts. *Colton* v. *Colton,*

127 U. S. 300.   It is no ground of criticism that others might have made a different will.   That she did not give the fee to her husband, but to her adopted son and niece, burdened with this precatory trust, may have been owing to a fact which is, at least, suggested by the testimony, that her husband was visionary, and she feared might waste his property in developing some of his supposed inventions.   That she was justified in placing confidence in the affection of the devisees for her husband is shown by the fact that they conveyed to him a large portion of the property upon hearing that he was dissatified with the contents of the will.   It is true that some time thereafter, owing to his contemplated marriage, the pleasant relations between him and them seem to have ceased, but this unfortunate condition does not prove that the testatrix did not at the time have good reason to trust in their affection for him.

Turning now to the testimony offered to show undue influence, it comes from two witnesses, Mrs. Stone, the daughter of the appellee, and Fanny Perry, a colored servant in the house of the testatrix.   Mrs. Stone's testimony is mainly concerning the condition of the testatrix during her last sickness, and had a tendency to show that she was in a drowsy condition, if not unconscious, during the last fourteen days of her life, though as she was at the house of the testatrix only every other day, and then for but a few minutes at a time, her testimony was properly considered by the jury as of no great significance and overborne by that of the physician and other witnesses.   She does testify to one thing in reference to Mrs. Johnson, which will be considered hereafter.   The only other witness, and the one upon whom the appellee substantially relies, is Fanny Perry, the servant.   Now, in respect to her testimony, and indeed all the testimony in the case, it must be observed that there is not a syllable tending to show that Louis Beyer, Junior, ever urged the testatrix to make a will, ever suggested or spoke to her in respect to the matter, and that all the connection he had with it was in response to requests to ascertain what would be the disposition of the property without a will, the validity of a will made on Sunday, and in suggesting the name of a lawyer to prepare the will and asking him to come.   Now, to find that

the will was obtained by undue influence on his part, when there is not the slightest syllable tending to show that he ever said or did a thing toward securing the execution of the will except at her request, is a proposition which cannot for one moment be entertained. With this must also be remembered that the will which was first drawn, the one executed on Sunday, made him the sole devisee, and that it was intended by the testatrix to vest the property absolutely in him, so as to deprive the appellee and other of her relatives of any interest in the property. That it did not have that effect was owing to a mistake of the scrivener in omitting the word "heirs," a mistake which, when discovered by him, he proceeded promptly to correct, and only when the corrected will was presented to her did she authorize a change so as to include Mrs. Johnson. Suppose it were true that Mrs. Johnson did after the first will by her importunity persuade the testatrix to include her as a devisee, the change wrought no prejudice to the interests of the appellee. It took away nothing from her. It only added a new devisee, and that not the appellee—another one to share in the property.

But now, let us see what is the testimony which is claimed to show that Mrs. Johnson exercised undue influence. Mrs. Stone testified that she boarded with the testatrix for a couple of years, (and that was a year or two before the death of testatrix,) and that during that time, when Mrs. Johnson seemed displeased at something, she heard the testatrix say that "it was because she did not make a will and she never intended to make a will." Fanny Perry testified that she lived with the testatrix about three years prior to her death; that Mrs. Stone called at the house on the Sunday when the first will was executed, and she heard Mrs. Johnson say to Louis Beyer, Junior, "you go down stairs, and after you get the wagon hitched up take Mrs. Stone around to the Christian Endeavor encampment first, and then take her home; if she knows what is going on here she won't leave here to-night unless she gets a share in the profits;" that she had heard Mrs. Johnson ask the testatrix to make a will, but the testatrix refused, saying that she would leave everything to Mr. Beyer just as it was, and for them to

stay with him and treat him right, and when he died he would do right by them. To which Mrs. Johnson replied: "This is the way you are going to treat me after I have been working for you all these years, and this will be all the thanks I'll get for doing it;" that after the testatrix had taken to her bed she asked her to make a will, but she said she would not, but would leave the property to her husband, to which Mrs. Johnson said: "Yes, you will leave it to him, and he will sink it in a boat or rum mill;" and the testatrix replied: "Nellie, how can you talk about your uncle like that?" and also, "Nellie, you are harassing me to death." Whereupon Mrs. Johnson said she would go if the will was not made, and the testatrix replied: "You have run Mrs. Stone out of the house to get something when I die. You said she was waiting for a dead man's shoes, but you are the one to catch it."

We put out of consideration the fact that Mrs. Johnson contradicts the witness and denies ever having urged the testatrix to make a will in her behalf or to make a will at all, and inquire whether, giving the fullest weight to this testimony, it warrants a finding that the execution of this will was secured by undue influence. We are clear that it does not. The conversations which the witness states were had while the testatrix was about the house and attending to her ordinary duties were conversations which might naturally be had between one brought up in the family, as Mrs. Johnson was, and one who had been to her as a mother. It would not be strange that having lived all her life in the family she felt that there was something due to her in respect to the disposition of the property. It will be remembered that it is not influence, but undue influence, that is charged, and is necessary to overthrow a will. The question No. 2 puts in the same category fraud, circumvention and undue influence. Placing undue influence along with fraud and circumvention interprets the character of the influence. *Noscitur a sociis.* Surely there is nothing in these conversations which has in it anything suggestive of fraud or circumvention, nothing wrongful or misleading.

With reference to the last conversation detailed by the witness, that which took place after the testatrix had taken to her

bed, it may be conceded that there is a display of urgency and petulance on the part of Mrs. Johnson and a rebuke on the part of the testatrix, but is there enough in it to justify a finding that the will was procured by undue influence? May not one situated as was Mrs. Johnson properly plead her claims for recognition in a will? May she not give her reasons why a will should be made and why property should not be left to a particular person without being subject to the charge of exerting undue influence? The only threat made by her was that she would go if the will was not made. We do not, of course, approve of such importunity to a sick person, and it may often be carried to such an extent that a jury is justified in finding that a will was executed in pursuance of it, and through undue influence, but these significant facts must be borne in mind in respect to this case : The witness, Fanny Perry, does not locate the time of this conversation, whether before the first will was executed or after. If before, plainly it had no effect upon the testatrix, for she made a will giving the property to her adopted son and leaving Mrs. Johnson out all together. If after, while it may have had the effect of causing the insertion of Mrs. Johnson's name in the second, such change wrought no injury to the rights of the appellee. If the testatrix had made up her mind to give her property to an adopted child with a precatory trust in behalf of her husband, then any change made in the devisees, as the result of whatever importunity, was a change which wrought no prejudice to the parties who were not named in either will.

We are clearly of the opinion that the jury were not under the circumstances of this case warranted in finding that the execution of the will was procured by fraud, circumvention or undue influence practised or exercised upon the testatrix.

One who is familiar with the volume of ligitation which is now flooding the courts cannot fail to be attracted by the fact that actions to set aside wills are of frequent occurrence. In such actions the testator cannot be heard, and very trifling matters are often pressed upon the attention of the court or jury as evidence of want of mental capacity or of the existence of undue influence. Whatever rule may obtain elsewhere we wish

it distinctly understood to be the rule of the Federal courts that the will of a person found to be possessed of sound mind and memory is not to be set aside on evidence tending to show only a possibility or suspicion of undue influence. The expressed intentions of the testator should not be thwarted without clear reason therefor.

The decrees of the Court of Appeals and of the Supreme Court of the District are reversed and the case remanded to the latter court, with instructions to set aside the decree in favor of the appellee, and for further proceedings in conformity to this opinion.

MR. JUSTICE HARLAN and MR. JUSTICE GRAY did not hear the argument and took no part in the decision of this case.