## LEACH *v.* BURR.

APPEAL FROM THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 145. Argued January 27, 1903.—Decided February 23, 1903.

Where an order is made on Friday by the Supreme Court of the District of Columbia in pursuance of the act of June 8, 1898, 30 Stat. 434, which requires publication of a notice at least twice a week for a period of not less than four weeks, two publications in each successive seven days, commencing on the day of the entry of the order, is sufficient. Such an order does not require two publications for four weeks, each of which commences Sunday and ends Saturday.

A party who in response to a published notice appears and goes to trial without objection or seeking further time cannot thereafter be heard to question the sufficiency of the notice.

On a proceeding to probate a will in the Supreme Court of the District of Columbia the burden of proof is on the caveators and if they fail to sustain this burden and but one conclusion can be drawn from the testimony, the trial court has power to direct a verdict. When that court has done so and its action has been approved by the unanimous judgment of the Court of Appeals, this court will rightfully pay deference to such action and opinion.

THE case is stated in the opinion of the court.

*Mr. George F. Hoar* and *Mr. William A. Meloy* for plaintiffs in error.

*Mr. J. J. Darlington* for defendant in error.     *Mr. R. B. Behrend* was on the brief.

MR. JUSTICE BREWER delivered the opinion of the court.

Plaintiffs in error, caveators in the trial court, seek a review of the order of the Supreme Court of the District, holding a special term for orphans' court business, in admitting to probate the will of Ezra W. Leach. The order was entered March 17, 1900, and on appeal was sustained by the Court of Appeals of the District, November 6, 1900. 17 D. C. App. 128. Thereupon this writ of error was sued out.

Whatever may have been the fact theretofore, it is not seriously questioned that by the act of June 8, 1898, 30 Stat. 434, the trial court had jurisdiction to entertain the application for probate, for by section 2 of that act it is provided that " plenary jurisdiction is hereby given to the said court holding the said special term to hear and determine all questions relating to the execution and to the validity of any and all wills devising any real estate within the District of Columbia and of any and all wills and testaments properly presented for probate therein, and to admit the same to probate and record in said special term." The specific objection to its action is an alleged defect in the publication required in case any party in interest is not found, the statute (sec. 6) providing that the court " shall order publication at least twice a week for a period of not less than four weeks of a copy of the issues and notification of trial in some newspaper of general circulation in

the District of Columbia, and may order such other publication as the case may require." The order was made on January 26, 1900, setting the hearing for February 26, 1900, and was "that this order and a copy of said issues heretofore framed shall be published twice a week for four weeks in The Evening Star." Publication was made January 26 and 30, February 2, 6, 9, 13, 16 and 20. There were, therefore, two publications in each successive seven days from the date of the order. January 26 was on Friday. The contention is that the work "week" means that series of days called a week commencing Sunday and ending Saturday, and that under this construction there was only one publication in the last week. *Ronkendorff* v. *Taylor's Lessee*, 4 Pet. 349, is cited as authority. In that case notice of a tax sale was required "by advertising, once a week, in some newspaper printed in the city of Washington, for three months," and it was held that this did not require a publication on the same day in each week, the court saying (p. 361):

"A week is a definite period of time, commencing on Sunday and ending on Saturday. By this construction, the notice in this case must be held sufficient. It was published Monday, January the 6th, and omitted until Saturday, January the 18th, leaving an interval of eleven days; still, the publication on Saturday was within the week succeeding the notice of the 6th."

But the language of this statute is not "for four weeks," but "for a period of not less than four weeks," and the words of the order must be construed in the light of the statute. A like difference was called to the attention of the court in *Early* v. *Homans*, 16 How. 610, where the publication was to be "once in each week, for at least twelve successive weeks," and commenting thereon it was said (p. 617):

"The preposition, for, means of itself duration when it is put in connection with time, and as all of us use it in that way, in our everyday conversation, it cannot be presumed that the legislator, in making this statute, did not mean to use it in the same way. Twelve successive weeks is as definite a designation of time, according to our division of it, as can be made. When we say that anything may be done in twelve weeks, or that it shall not be done for twelve weeks, after the happening of a

fact which is to precede it, we mean that it may be done in twelve weeks or eighty-four days, or, as the case may be, that it shall not be done before."

Further, the object of a notice is to enable the parties affected thereby to be present and obtain a hearing. The caveators appeared and without seeking further time, for the purpose of securing additional testimony or preparing for the hearing, went to trial on the issues submitted to the jury. They at least cannot claim to be prejudiced by any defect in the notice.

But the substantial question is whether the court erred in taking the case from the jury and directing a verdict sustaining the will. The questions submitted for consideration were whether the testator was at the time of executing the will " of sound mind, capable of executing a valid deed or contract ; " whether the will was "procured by the threats, menaces and duress exercised over him (the testator) by Samuel H. Lucas or any other person or persons," and whether it was " procured by the fraud of Samuel H. Lucas or any other person or persons."

Although jurors are the recognized triers of questions of fact, the power of a court to direct a verdict for one party or the other is undoubted, and when a court has done so and its action has been approved by the unanimous judgment of the direct appellate court, we rightfully pay deference to their concurring opinions. *Patton* v. *Texas & Pacific Railway Company*, 179 U. S. 658, and cases cited. An examination of the testimony satisfies us that there was no error in directing the verdict. The testator was seventy-three years old, white, childless, unmarried, his nearest relatives being cousins, the plaintiffs in error. He had lived in this District for at least twenty years. He was a man positive in his opinions, not easily influenced, of strong religious convictions and much attached to his church. His business was that of a florist. He owned two or three parcels of real estate of the value of about $8000, and also a little personal property worth something like $300. The devisee was Samuel H. Lucas, a young colored man, with whom alone he had kept house for ten or a dozen years, such relation commencing at his invitation and continuing by his wish. For some years Lucas had the general management of the business. Testator's illness

was brief, lasting only eight days. He died on December 21, 1896, between 12 and 1 o'clock. Early in the morning of that day, between 9 and 10 o'clock, the pastor of the church to which he belonged called, and to him he said :

" Pastor, I did not expect to go so early ; there are some things which I wanted to perform and have neglected. I wanted to give the church a parsonage. I cannot do it now ; it is too late. I will be unable on account of the laws of Maryland, which apply to the District of Columbia, to do anything of that sort, for they will not allow a man to do anything of that sort within thirty days of the time of his death. I want you to prepare the papers and turn everything over to Sam."

Thereupon the pastor sent for a notary and prepared a deed conveying the real estate to Lucas. After that had been executed the pastor, who had never before prepared a deed, suggested that possibly he had not got everything in just right, and that if the testator wanted to make sure he could make a will. The testator then asked the notary to draw up a will, and it was drawn up and executed. At the time he directed the preparation of the deed he told Lucas what he would like to have done in reference to the parsonage, and Lucas replied that he would carry out his wishes. There was not a syllable of testimony, not a hint, that Lucas, or any other person, requested or suggested any disposition of the property. All that was done was done at the instance and upon the request of the testator. The caveators called four witnesses as to his mental condition, only one of whom was present at any time during his sickness, and that the pastor above referred to. So far from their testimony tending to show mental weakness, it was abundant and emphatic that he was a man of positive convictions, clear-headed, though perhaps eccentric in some views, but at all times fully capable of making his own contracts and attending to his own affairs. The testimony of the pastor who, as stated, was present on the morning of his death and detailed the circumstances of that interview, shows that his mind was then clear, that he knew what he was doing, and was simply attempting to carry out by the deed and the will that which had been for a long time his intention. Neither his attending

physician, the notary, the executor, nor Lucas were called as witnesses, although all were present that morning. Evidently the caveators were content to rest their case in this respect upon the evidence of the pastor. Seven physicians were called who, upon a hypothetical question, substantially concurred that it was contrary to their experience and reading that a man seventy-three years of age, dying of acute pneumonia, should have testamentary capacity between three and four hours before death. The only evidence of the cause of his death was the certificate from the health department, which named as such cause broncho-pneumonia. One of these seven physicians testified (and he alone gave evidence in that respect) that the unconsciousness preceding death from acute pneumonia was not characteristic of death from bronchial pneumonia, and that the circumstances disclosed by the pastor would tend to show that there was not mental inability to make a valid deed or contract. That acute pneumonia, especially in one of his age, would ordinarily cloud the intellect for hours before death would be irrelevant to the question of his mental condition that morning, unless it was shown that he was suffering from such disease, and that does not appear.

From this direct testimony but one conclusion could be drawn, and that in favor of the mental soundness of the testator at the time he made the will. Nor is the caveators' case strengthened by that which counsel so forcibly presented to our attention, to wit, the right of a jury to take into consideration that which is common knowledge and springs from the ordinary experiences and relations of life. The testator was a white man, the devisee colored, and race prejudice we all know exists. But this testator, eccentric in his views and of positive convictions, is shown to have made this colored man his business and household companion for years. Such continued intimacy, excluding other parties therefrom, is satisfactory evidence that he at least was not moved by such prejudice. The potency of blood relationship is also appealed to, but affection between cousins is often not very strong. The testator lived in this District while the caveators lived in New England, and the testimony fails to show that he visited them or they him ;

that they ever even corresponded, or that the caveators ever manifested any interest in him or his until after his death, when they asserted a right to inherit his property.

Upon questions of this kind submitted to a jury the burden of proof, in this District at least, is on the caveators. *Dunlop* v. *Peter*, 1 Cranch C. C. 403. See also *Higgins* v. *Carlton*, 28 Maryland, 115, 143 ; *Tyson* v. *Tyson's Executors*, 37 Maryland, 567. The caveators in the present case failed to sustain this burden, and we are of the opinion that the trial court did not err in directing a verdict against them.

The judgment is

*Affirmed.*