# ROBINSON *v.* DUVALL.

WILLS; TESTAMENTARY CAPACITY; UNDUE INFLUENCE; EVIDENCE; WIT-
NESSES, IMPEACHMENT OF; INSTRUCTIONS TO JURY; REVERSIBLE ERROR;
INSANE DELUSIONS; DECLARATIONS AS EVIDENCE.

1. The rule of the Federal courts is that the will of a person found to be possessed of sound mind and memory is not to be set aside on evidence tending to show only the possibility or suspicion of undue influence. (Following *Monogue* v. *Herrell*, 13 App. D. C. 455; *Stant* v. *American Security & T. Co.* 23 App. D. C. 29.)

2. Where a testator has the capacity to make a will, resentment he bore to one of his heirs at law, whether well or ill founded, will not invalidate his will.

3. While undue influence is closely allied to fraud, and when resorted to by a crafty person its presence often becomes exceedingly difficult to detect, yet it is not enough that a caveator, displeased with a will, suspects the exercise of such undue influence, and vainly interrogates the caveatee whom he suspects, but whose denial is convincing and whose testimony is credible.

4. Where in a will contest the trial court, in the presence of the jury and in reply to a contention of the caveator that certain petitions in the case, sworn to by the executor, tend to impeach the executor as a witness, remarks that such petitions do not in the slightest impeach the witness, but in charging the jury tell them that they are the sole judges of the facts, and that if the court expressed any opinion as to the facts it was inadvertent and they should disregard it, such remark will not constitute reversible error.

5. The refusal of a prayer for instructions to the jury is not reversible error where, in so far as it properly stated the law, the court in its

general charge and in other granted instructions fully covered its propositions,—especially where the prayer itself was vague and uncertain.

6. Mere eccentricities, prejudices, or resentment against one or more relatives, without more, will not justify setting aside a will on the ground of mental incapacity.

7. It is not error for a trial court in a will contest to refuse a prayer of the caveator to the effect that the opinion of a subscribing witness to the will is of no more weight than the testimony of an equally credible and intelligent witness, and to grant a prayer of the caveatee to the effect that the testimony of a subscribing witness, other things being equal, is entitled to more weight than that of a witness who was not present at the time of the execution of the will.

8. Where the question involved in a will contest is as to whether the paper writing is the will of the decedent, it is not error for the court to refuse to instruct the jury that, as matter of law, the children of a deceased niece of the decedent were not entitled to any portion of the decedent's estate under the terms of the alleged will, and that if such children were the natural objects of his bounty, and decedent did not have mind sufficient to recall them, "and for that reason alone" failed to provide for them, then the disputed paper is not a valid will. In such a case the court is not called upon to construe the will, or instruct the jury whether its provisions are legal.

9. In the absence of any evidence in a will contest. which would justify the jury in finding that the alleged will was the result of insane delusions, it is not error for the trial court to so instruct the jury.

10. While declarations of a witness in a will contest who is also a beneficiary under the alleged will are admissible, upon proper foundation being laid, for the purpose of impeaching or discrediting his testimony, they are not competent for any other purpose.

No. 1641.   Submitted March 7, 1906.   Decided May 11, 1906.

HEARING on an appeal by the caveator from an order of the Supreme Court of the District of Columbia sitting as a probate court, admitting to probate an alleged last will and testament, issues of fact having been found by the jury in favor of the caveatee.                                    *Affirmed.*

The COURT in the opinion stated the facts as follows:

This is an appeal by Eugene F. Robinson, caveator below,

from an order of the Supreme Court of the District of Columbia holding a probate court, admitting to probate and record in that court a paper writing, dated April 18, 1902, as the last will of James S. Robinson.

The questions to be decided here do not make it necessary to recapitulate all the evidence. The trial was had upon three issues. The first was as to the execution and attestation of the paper writing of April 18, 1902, as the last will of James S. Robinson. The second was whether at the time of its execution said Robinson was of sound and disposing mind and capable of executing a valid deed or contract; and the third was whether the execution of said paper was procured by fraud, misrepresentation, or artifice, or while said James S. Robinson was under the undue influence of Snowden W. Robinson, or Alvira Robinson, or any other person or persons. Upon all the issues the verdict was for Andrew B. Duvall, executor, Snowden W. Robinson, and others, caveatees, the appellees here.

At the trial there was no dispute concerning the execution of the will, the matter involved in the first issue. At the close of the evidence the learned court below instructed the jury to find for the appellees upon the third issue, as to fraud and undue influence, and the jury found for the appellees upon the second issue, as to the capacity of James S. Robinson to make such a will.

James S. Robinson executed this will April 18, 1902 when he was about seventy years of age. On the evening of August 4, 1902, he fell into an areaway in the rear of the home of his brother, Snowden Robinson, at whose house he had lived during the last six weeks of his life. James S. Robinson died a few hours after this accident. In early life he had been a bookbinder in the Government Printing Office, and had acquired considerable property. About twenty years before his death he ceased to be employed in the government service, and gave his attention to his property, worth about $50,000. He was a bachelor, fond of money, and busied himself about a number

of small houses which he owned, and with the collection of his
rents.

The testator had a brother Snowden, who survived him; a
brother Somerset, who died several years before the testator
and without issue; a brother Bushrod, who died in December,
1901, leaving one son, Eugene F. Robinson, the caveator; a
sister, Ellen Atz, who died about January, 1902; a sister,
Mahala Duley, who died years before, leaving children who
survived the testator, and also children of one of her deceased
daughters; and another sister, Martha Collins, who had died
before the testator, leaving children surviving.

By his will of April 18, 1902, the testator left a legacy of
$200 to the Mt. Vernon Methodist Episcopal Church, South; a
legacy of $5 to his nephew, Eugene Robinson, son of Bushrod
Robinson, deceased.  The residue of his estate was given, one
third to his brother, Snowden Robinson; one third to the chil-
dren of his deceased sister, Martha Collins; and one third to
the children of his deceased sister, Mahala Duley, the devises
and bequests in each instance to the children of a deceased sister
being to the children, their heirs and personal representatives,
said children to take *per stirpes,* and not *per capita.*   Andrew
B. Duvall was appointed executor and trustee, with certain
powers.

On the part of the appellant the evidence tended to show
that the testator was a peculiar man, whose habits were unclean-
ly; that he had been very intemperate for the last ten years of
his life; that he was penurious, suspicious, and forgetful.  Some
witnesses were of the opinion that his mind had been unsound
during the last year of his life; others that the period of un-
soundness included the last five years.   Some said he was a
very feeble-minded old man, and numbers were of the opinion
that during the last year of his life he was incapable of making
a valid deed or contract, and was very susceptible to influence
if unduly exerted.

On behalf of the appellees the testimony strongly tended to
show the testator was of sound mind and a shrewd and capable
man, not easily influenced; and much evidence was introduced

to show that he was thrifty, that he attended to his own business, and that, although he had been a drinking man during the last year and a half of his life, very many witnesses familiar with his life testified either that he was always sober, or that he was rarely under the influence of liquor. The testimony of many intelligent witnesses was emphatic that the testator was a man of much intelligence and decided capacity for business, cautious in speech, that he was neat and cleanly in his attire, and there was no trace of mental unsoundness.

Mr. Michael J. Keane, a witness for the caveator, and an attorney, testified that about April 1, 1902, the testator had asked Mr. Keane to write a will for him, at the same time naming the amounts he intended to leave to his kindred, and stating that he only intended to give $5 or $10 to Eugene Robinson, the testator saying Eugene had been trying to get the better of him as to some property and he intended to cut him off. Mr. Keane prepared the paper. Mr. A. B. Duvall and Mr. Keane were the executors, with power to sell. The testator gave a small legacy to the Mt. Vernon Methodist Episcopal Church, South; and gave $18,000 to Snowden Robinson; the same to the children of Mahala Duley, and the same to Martha Collins, *per stirpes;* the residue to be distributed in the same way. On April 15, the testator called on Mr. Keane, and asked for the sheets on which the will had been written, and said he would not execute the will at that time, because he might be doing Eugene an injustice, and thereupon testator destroyed the paper. Mr. Keane said testator was a shrewd business man, that he was very careful in his instructions concerning the will, and understood the effect of the will; and Mr. Keane never questioned the testator's capacity to make a will, and had never seen the testator under the influence of liquor.

Mr. Andrew B. Duvall testified that he had known the testator for twenty years, and frequently attended to legal matters for him; that the testator came to his office April 16, 1902, and said he wanted to make his will, that he wanted to leave his property to his kinsfolk excepting Eugene; he wanted to make a legacy to the Mt. Vernon Southern Methodist Church. The testator produced a typewritten draft of a will similar in pur-

port to his oral expression of his purpose, and asked Mr. Duvall if it was necessary to leave something to an heir you want to disinherit. The draft of a will which testator produced had such a provision, and Mr. Duvall said it was just as well to put such a provision into the will. Testator said his property consisted of real estate, and it was unencumbered, and suggested that it would be better that the property be held together by a trustee for several years in order to work off the trusts and handle the property to advantage, and after discussing the matter, Mr. Duvall wrote into the will he prepared the direction that the executor and the trustee should hold the property for three years unless exigencies required its sale sooner. The testator told Mr. Duvall that one of his nieces, a child of his sister Mrs. Duley, had died leaving children, and he named them, and he wanted to know if the provision he had in the draft of a will he produced, and which Mr. Duvall embraced in the final will, was sufficient to cover that; and Mr. Duvall advised him that as it was phrased in the draft which Duvall had prepared, the will would provide for the children of that niece or any other niece or nephew who might die leaving children. The testator said his only purpose in making the will, except as to the legacy to the church, was to give the nominal legacy to Eugene, and that otherwise he wanted his property to go as it would go according to law. The draft the testator gave Mr. Duvall contained the name of Mr. Keane along with Mr. Duvall as executor and trustee, and the testator said that Keane was a young lawyer friend of his. Mr. Duvall called in George, his stenographer, to whom he dictated the will, and the testator read the typewritten copy, which testator said appeared to be right. Mr. Duvall gave instructions as to the execution of the will, and the testator paid Mr. Duvall his fee and took a receipt therefor. On April 18 testator returned to Mr. Duvall's office, and said that he had concluded that two years was long enough for the duration of the trust, and Mr. Sinclair this time rewrote the paper. After it was finished, testator said he wanted to execute the will, and Mr. Duvall's three assistants witnessed the will, and at testator's

request Mr. Duvall put the will in his safe and gave a receipt therefor.

In March of the same year testator had called upon Mr. Duvall. He appeared disturbed about a letter from Henry Stewart concerning the debts of his deceased sister, Mrs. Atz, and said he could not understand how this sister could have been indebted to his brother, Bushrod Robinson, to the amount of $3,800, as appeared by a note held by Stewart as executor of the estate of Bushrod Robinson, and said that he had told Stewart that there was something wrong about it, and unless Eugene Robinson, the son of Bushrod Robinson, fixed the matter satisfactorily, Eugene would be the loser by it. The testator called upon Mr. Duvall before and after the time of the execution of the will, and on every occasion he was sober. Once or twice Mr. Duvall had seen the testator a little under the influence of liquor, and on such occasions would defer the transaction of business; but Duvall had never seen the testator drunk, and testified that at all times the testator's mind was sound, in the opinion of the witness. George, Sinclair, and Schuldt, the witnesses to the will, two of whom were acquainted with the testator, testified concerning the testator's visits and the execution of the will, and also to his sobriety on that occasion, and to the soundness of his mind then and at all times, to the extent of their knowledge.

*Mr. Henry C. Stewart, Mr. Mason N. Richardson,* and *Mr. Charles H. Merillat* for the appellant.

*Mr. Edward H. Thomas* and *Mr. Andrew B. Duvall* for the appellees.

Mr. Justice McComas delivered the opinion of the Court:

There are eleven assignments of error.

1st. It is claimed in the first and second assignments of error that the court erred in directing the jury to find a verdict in favor of the caveatees on the issue of fraud and undue influ-

ence. At the trial there was no evidence of fraud or undue influence on the part of Snowden W. Robinson, or of Alvira, his wife. The appellant called as a witness Susan Collins, one of the children of the testator's deceased sister, a caveatee under the will, who, in substance, testified that during the last year of the testator's life she had seen him twice a week; that in February and March, 1902, she had talked with him about Mrs. Atz's property and Bushrod Robinson's interest therein, and that she at one time held a note for $300 against Mrs. Atz's property, and at witness's request her uncle, Bushrod Robinson, had assumed the payment of that note, and about this she talked with her uncle, the testator; she had never spoken to him about Mrs. Atz's note for $3,800 given to her uncle, Bushrod Robinson, because she never had knowledge of it. About March, 1902, the testator talked to her about this $3,800 note, after Stewart had written testator concerning it. The testator was grieved and hurt and the witness surprised to hear of it, for she had never known her uncle Bushrod to have given money to her aunt; that the witness had told the testator that her uncle Bushrod had paid for the aunt the $300 note some years before, and recurred to it only to discuss the $3,800 note.

For months before the testator died he had told witness he was going to make a will, and during April he spoke of it every time he saw her, and then said, "I am going to leave Eugene out; I have repeatedly sent for Eugene to come to see me and talk over business affairs in regard to your Aunt Ellen's property, and he never would come;" and the witness said, "Wait, probably he will come;" and later, that she told him (Eugene) to go, visit the testator, and that she went to see Eugene one Sunday afternoon, and asked him to call on her uncle James some time, as he was very anxious to see Eugene and talk to him; that his uncle felt hurt about him; and before she left she made him promise that he would soon go to see his uncle. She denied she had ever asked Eugene to speak to his uncle James about making a will, though Eugene later testified that she had so said, and that he had told her that she herself should ask uncle Jim about the will. She testified that on April 16

her uncle said he had made his will. Years before this witness had lived with her uncle James two years, and thereafter she usually visited him twice a week, and kept his clothes in repair, and read to him, and he would read to her, and they would talk together about his travels. The testator told her he intended to leave the Mt. Vernon Church something, but had never told her anything else concerning the contents of the will, and she had never asked him to leave her anything; that he never gave her any money except on one occasion a five-dollar gold piece, and that she never exercised any influence over him at all. She insisted that three or four times she persuaded her uncle to wait, and Eugene would come to see him, and that Eugene came to see her uncle about the release of a deed of trust, and her uncle was pleased that Eugene came at last, saying that he had come to ask the uncle to do him a favor; and she remembered that her uncle told her Mr. Keane had written the will, and later she knew it was destroyed and that Mr. Duvall had made the new will. It is to be observed that Susan Collins did not live in the house of the testator; that she was employed in the Government Printing Office, and had no opportunity to exclude others from access to her uncle, and that she was not favored in the testator's will, and received the same benefits given to all the children of the testator's deceased sister, Martha Collins, and no more. She did not procure either Mr. Keane or Mr. Duvall to prepare the testator's will.

Eugene Robinson rarely visited the uncle. From 1896 until June, 1902, the testator boarded with Mrs. Mary E. Diver, who testified that sometimes Snowden Robinson called to see testator on Sunday, but that she did not know Eugene Robinson; and Olivia Duley testified the testator claimed that Eugene never treated him with respect and would not speak to him on the street, and for that reason testator said that when he made a will he would leave Eugene out. True, Eugene Robinson testified that he had three times taken his uncle home when he was intoxicated, that his uncle was slovenly, and that for years he believed his uncle was of unsound mind, and that

the caveator frequently visited the testator, who was very friendly.

The learned court below was justified in instructing the jury to return a verdict in favor of the caveatees upon the third issue. There was an utter failure of evidence showing the exercise of undue influence by Snowden Robinson, or by Alvira, his wife, the persons specifically charged in this issue, and a failure to show that Miss Susan Collins had sought to influence, or had unduly influenced, the testator concerning the disposition of his property. The Supreme Court says: "In such actions the testator cannot be heard, and very trifling matters are often pressed upon the attention of the court or jury as evidence of want of mental capacity or of the existence of undue influence. Whatever rule may obtain elsewhere, we wish it distinctly understood to be the rule of the Federal courts that the will of a person found to be possessed of sound mind and memory is not to be set aside on evidence tending to show only a possibility or suspicion of undue influence. The expressed intentions of the testator should not be thwarted without clear reason therefor." *Beyer* v. *LeFevre,* 186 U. S. 114, 125, 46 L. ed. 1080, 1085, 22 Sup. Ct. Rep. 765. See *Leach* v. *Burr,* 188 U. S. 510, 513, 47 L. ed. 567, 569, 23 Sup. Ct. Rep. 393; *Stant* v. *American Security. & T. Co.* 23 App. D. C. 29; *Manogue* v. *Herrell,* 13 App. D. C. 455. There was evidence that the testator was displeased with the caveator. Such resentment often leads a testator to cut off a legatee, but where the testator has the capacity to make a will, it is his will, whether the resentment is well or ill founded; the testamentary paper is not invalidated on account of it. See *Re McLane,* 21 D. C. 554. There was no evidence of such importunity as would deprive the testator of his free agency; indeed, no evidence that Susan Collins sought to exercise such influence. It is true that such importunity pressed upon a testator too weak to resist will render the signed instrument not the testator's free and unconstrained act. Such undue influence is closely allied with fraud, and when resorted to by a crafty person its presence often becomes exceedingly difficult to detect; yet it is not enough that a caveator, displeased with a will, suspects the exercise of such

undue influence, and vainly interrogates the caveatee whom he suspects. In this instance the denial of Susan Collins is convincing. Her testimony is credible. No other witnesses, indeed, no circumstances contradict her statement of her innocence. Apart from the exclusion of the caveator, the estate of the testator was given to his kindred in the manner one would ordinarily expect, and Susan Collins received no benefit under the will except such as came to her as one of the children of the testator's deceased sister, Martha Collins. Usually the direct result of undue influence is accompanied by some beneficial provision in the will favoring the person charged, with such exercise of undue influence. The learned court below correctly instructed the jury to find for the caveatees upon the third issue.

2d. The third assignment of error is that the court erred in saying in the presence of the jury that the original and amended and supplementary petitions filed in this case in the probate court did not tend in the slightest to impeach the witness, Mr. Duvall, then upon the stand. There is no merit in this objection. We have carefully examined these papers and the related evidence in the record relied on, and fully agree with the learned court below that the papers did not tend to impeach Mr. Duvall. If, however, this casual comment might have influenced the jury, the learned court below, at the conclusion of the testimony, and in beginning his charge to the jury, sufficiently cautioned the jury in such terms that the appellant had no reasonable ground to complaint. The court said:

"Gentlemen of the jury, at the outset of the remarks which I shall make to you I wish to say that these instructions are given to you by the court for your guidance as to the application of the principles of law to the testimony which has been submitted to you, but that you are the sole judges of the facts, and it is your special province to judge of the credibility of the witnesses and the weight to be given to the testimony as tending to prove the facts alleged by either party to this controversy. And if I have manifested, in any way, any opinion that I may have as to the facts, it has been inadvertent, and you will disregard it. I do not know that I have, but if I

should have, by any act or statement of mine, indicated any opinion I may have in the facts, you should ignore it."

3d. The assignments of error from four to ten inclusive relate to certain instructions granted and refused by the court below. These instructions are too long and too numerous to be recited here.

The court did not commit reversible error in refusing the appellant's fourth instruction. So far as it was a proper statement of the law, the court fully covered its propositions in the general charge and in other instructions. The prayer itself was confused and inconsistent and was properly rejected.

The court did not commit error in granting the eleventh prayer of the caveatees. The jury were cautioned that they could not find the testator incompetent to make a will, if they found he was prejudiced against some of his relatives, or had any of the eccentricities mentioned in the evidence. Mere eccentricities do not justify setting aside a will on the ground of mental incompetency, and the instruction added that the evidence upon this point was to be considered only in connection with all the other evidence bearing upon the mental incompetency of the testator at the time of the execution of the will. A testator may be eccentric, opinionated, peculiar, and yet may be a shrewd man of business, capable of managing his own affairs and disposing of his property by deed or will. Mere eccentricities, prejudices, or resentment against one or more relatives, without more, cannot invalidate a will. See *Turner v. Hand,* 3 Wall. Jr. 88, 103, Fed. Cas. No. 14,257.

The court below committed no error in refusing the eleventh prayer of the caveator, which stated that the opinion of a subscribing witness to a will is of no more weight than the testimony of an equally credible and intelligent witness, and in granting the twelfth prayer of the caveatee, which stated that the testimony of a subscribing witness, other things being equal, is entitled to more weight than that of a witness who was not present at the execution of the will. The testimony of these two different classes of witnesses on the subject of mental capacity is not precisely on the same footing as to value. The

attesting witnesses are considered in the law as placed round the testator to protect him against fraud in the execution of his will and to judge of his capacity, and it is their duty to inform themselves of his capacity before they attest his will, and therefore these witnesses are permitted to testify as to the opinion they formed of the testator's capacity at the very time he was executing his will. The mere naked opinion of other persons not occupying the positions of medical men are inadmissible in reference to the mental capacity of the testator whose will may be controverted. Some such witnesses may have such knowledge as may make their opinions of testamentary capacity admissible, but such witnesses lack the opportunity given to the subscribing witnesses to form an opinion of the testator's capacity at the moment when he executed his will. See *Berry Will Case,* 93 Md. 594, 49 Atl. 401; *Townshend* v. *Townshend,* 7 Gill, 27; *Williams* v. *Lee,* 47 Md. 325. Appellant's counsel insist the phrase, "the testimony of such witnesses, *other things being equal,* is entitled to more weight" than that of witnesses not present at the execution of the will, is very objectionable. They argue that a great many meanings may be given to the phrase, "other things being equal." In this collocation it meant only to contrast the two classes of witnesses, subscribing and nonsubscribing, yet equally credible, intelligent, and disinterested.

The twelfth prayer of the caveator, which asked the court to instruct the jury concerning the legal effect and import of one clause in the disputed will, was properly rejected by the court. The attorney who prepared the will had instructed the testator that if Mrs. Shipley, daughter of Mrs. Duley, died before the execution of the will, leaving children, such children would take under the terms of the will the attorney had drawn. It would mislead the jury to have them consider this clause apart from the residuary clause, and yet the caveator asked the court to instruct the jury that, as a matter of law, the children were not entitled to any portion of the testator's estate, and that if such children were the natural objects of his bounty, and the testator did not have mind sufficient to recall them, *"and for*

*that reason alone"* failed to provide for them, then the disputed paper is not a valid deed.

The undisputed testimony was that Mr. Duvall instructed the testator that under the language of the will the children of the deceased niece, a daughter of Mrs. Duley, would take *per stirpes.* If Robinson, who relied upon his attorney, should mistake the law, or if his attorney so erred, the will would not necessarily be invalid. We are not prepared to say that if a man seventy years old should happen to omit any provision for one family of grand nieces and nephews, that such omission would invalidate a will. We refrain from considering the legal effect of this devise, because the only issue the jury had to decide was whether the writing was the will of the testator, and the court was not called upon to construe the will and to instruct the jury whether its provisions were legal or not. *Lilly* v. *Tobbein,* 103 Mo. 487, 23 Am. St. Rep. 887, 15 S. W. 618. This prayer was otherwise confused and misleading.

In the fourth prayer of the caveatees the court rightly instructed the jury that there was no evidence in this case justifying a finding that the will in controversy was the result of any insane delusion. There was no evidence whatever to induce the learned court below to reject this instruction, and appellant's counsel only asked for its rejection upon several extracts from the answers of two medical men to the hypothetical questions put by the caveator's counsel. There is nothing in the record upon which to base such an assignment of error.

The last assignment of error relied upon by the appellant is his objection to the court's instruction that, if the jury found witnesses made different statements out of court from what they made on the witness stand, the jury were entitled to consider such evidence in weighing the testimony of such witnesses, but "they should not allow such evidence to have any influence in establishing any alleged facts contained in said statements so made when the witnesses were not testifying in this case, and whether made verbally or in writing, because such statements can only be hearsay and inadmissible unless for the purpose of affecting the credibility of the said witnesses." The proposition is not clearly expressed nor accurately limited to

certain witnesses. The appellant's counsel correctly insists that it related to certain declarations of Snowden Robinson, a caveatee. Snowden Robinson was a witness, and testified that in his opinion his brother had capacity to make a will or deed. The caveator was permitted to call two witnesses who gave testimony to show that on the night of the testator's death Snowden Robinson, the caveatee, had expressed an opinion of his brother's mental incapacity at that time. Contradiction was admitted by the court as affecting the credibility of the witness. Appellant's counsel now insist that such expression of opinion was an admission which the jury should have considered in deciding upon the issue against all the caveatees. The court below ruled as the Supreme Court had ruled in *Ormsby* v. *Webb,* 134 U. S. 47, 65, 33 L. ed. 805, 812, 10 Sup. Ct. Rep. 478:

"The second and third exceptions refer to the exclusion of testimony tending to show, by the declarations of Mrs. Stewart, one of the principal legatees, made about or after the date of the execution of the will, that she had knowledge at that time of the execution of the will and its provisions. The exclusion of this evidence was right. The proper foundation being laid, the declarations of Mrs. Stewart could have been proved for the purpose of impeaching or discrediting her testimony as a witness for the caveatees. But such declarations, not under oath, whenever made, were not competent for any other purpose, upon the trial of the issue as to competency to make a will. She was not the only legatee who was interested in the issues to be tried."

We find no error in the rulings of the learned court below. The order and decree of the Supreme Court of the District of Columbia holding a probate court admitting the paper in question to probate and record as the last will and testament of James S. Robinson, must be affirmed, with costs, and it is so ordered.                    *Affirmed.*

An appeal to the Supreme Court of the United States was prayed by the appellant and allowed May 21, 1906.