## BROOKE v. BARNES.
### No. 5553.

Court of Appeals of District of Columbia.
Argued April 4, 1932.
Decided May 2, 1932.

C. F. R. Ogilby and Paul E. Lesh, both of Washington, D. C., for appellant.

S. T. Ansell, B. T. Ansell, and G. M. Wilmeth, all of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, and GRONER, Associate Justices.

ROBB, Associate Justice.

Appeal from a decree in the Supreme Court of the District denying probate of the will of Harriet P. Gunnell upon the verdict of the jury that it was procured by the undue influence of her daughter, appellant Mary F. Brooke.

The will was dated January 17, 1914. We quote from it as follows:

"Because of large sums of money and assistance given by me to my son, Joseph F. Barnes, during my lifetime, and because of the further fact that he is now in receipt of a competent income as an officer in the United States Army, I make no provision for him in this my last will and testament other than the sum of one hundred dollars, which I direct shall be paid to him by my executrix, hereinafter named.

"After the payment of my just debts and funeral expenses and the above legacy to my son, I give, devise, and bequeath to my beloved daughter, Mary F. Brooke, born Barnes, in consideration of her love and care, through years of devotion, for myself and my husband, all the rest and residue of my

property and estate, of whatsoever kind or nature and wheresoever the same may be situated, and of which I shall die seized and possessed or in any manner entitled to, in fee simple absolutely."

Testatrix died August 22, 1930, at the age of 83 years. She was therefore 67 years old when her will was executed, and lived sixteen years thereafter. Her sole heirs at law and next of kin were her two children: George F. Barnes, the caveator, a lieutenant colonel in the United States Army; and Mary F. Brooke, caveatee, wife of Lieut. Col. Mark Brooke, of the Engineer Corps of the Army.

The testamentary capacity of the testatrix was not challenged, nor was there ground for such a challenge, since the evidence disclosed that Mrs. Gunnell at the time of making her will was a lady of intelligence and culture. There was no evidence of any change in her mental status during the remainder of her life. On the contrary, the evidence indicated continued mental alertness and independence of thought and action.

At the time of the execution of the will the family consisted of the husband of the testatrix, Dr. Francis P. Gunnell, Surgeon General of the United States Navy, retired (then 86 years of age), who lived for eight years thereafter; the caveator, then 36 years of age and unmarried (married in February, 1914); the caveatee, who was then 31 years old; and caveatee's daughter, then 7 years of age. The caveator was then stationed at Fort Riley, Kan. Caveatee's husband was Assistant Commissioner of the District and with his family lived with the Gunnells in the family home. Mrs. Brooke was not present when the testatrix instructed the draftsman of the will as to what its contents should be, nor was she present when the will was executed. At that time the value of the testatrix' estate was almost negligible.

The bulk of the property possessed by her at the time of her decease (real estate of the value of $6,500 and personal property of the approximate value of $62,000) was left to her by Dr. Gunnell at his death in 1922.

Both before and after the execution of the will the Brooke family, while Colonel Brooke was stationed in Washington, made their home with Mrs. Gunnell. There were times after the execution of the will when, owing to Colonel Brooke's assignments away from Washington, his family did not live here.

As already indicated, the sole issue submitted to the jury was whether undue influence was exercised by Mrs. Brooke over her mother. The burden of proof was on caveator. Leach v. Burr, 188 U. S. 510, 516, 23 S. Ct. 393, 47 L. Ed. 567; Brosnan v. Brosnan, 263 U. S. 345, 44 S. Ct. 117, 68 L. Ed. 332.

As a circumstance indicating undue influence, it is contended by caveator that the recital in the will that the testatrix had given in her lifetime to him "large sums of money" was an exaggeration. The evidence disclosed that although the total of the sums advanced by the testatrix to her son, the caveator (amounting as it did to less than $1,000), was not in fact large when compared with the value of her estate at the time of her death, nevertheless it was large in comparison with the value of her estate at the time she made her will. We think, therefore, that the statement was justified and made by the testatrix in good faith.

It is next insisted that the recital that the residue was given to Mrs. Brooke in consideration "of her love and care, through years of devotion, for myself and my husband," was inaccurate; that, in fact, Mrs. Brooke's motive was selfish and not actuated by her sense of duty to her mother. The evidence is directly to the contrary, including letters written by caveator himself in which he recognized and acknowledged his sister's devotion to her mother.

During the course of caveator's testimony it developed that he had borrowed money from his stepfather, Dr. Gunnell (which he was delinquent in repaying), and that he had invested and lost it in ill-advised financial ventures. The evidence falling from his own lips indicates very clearly his lack of business capacity, and that his mother would have been justified in concluding that any property coming into his hands would be lost in unwise speculation.

The caveator further testified as to the existence of ill will between his sister and himself, and particularly of a conversation in May, 1915, in the Philippines in which his sister is alleged to have said that he was disinherited; that she had fixed it so that their mother had written him out of the home as a son; and that "you can expect nothing from mother." Later the caveator testified that the receipt of a copy of the will after his mother's death was "the first intimation that he had that a will had been made of this tenor."

There was some evidence as to the "dom-

ineering character" of Mrs. Brooke, but no evidence that she exercised undue influence over anyone, including her mother.

In Beyer v. Le Fevre, 186 U. S. 114, 22 S. Ct. 765, 768, 46 L. Ed. 1080, the issue was whether a will had been procured through undue influence. The court stated that: "It is no ground of criticism that others might have made a different will. * * * It will be remembered that it is not influence, but undue influence, that is charged, and is necessary to overthrow a will. * * * One who is familiar with the volume of litigation which is now flooding the courts cannot fail to be attracted by the fact that actions to set aside wills are of frequent occurrence. In such actions the testator cannot be heard, and very trifling matters are often pressed upon the attention of the court or jury as evidence of want of mental capacity or of the existence of undue influence. Whatever rule may obtain elsewhere we wish it distinctly understood to be the rule of the Federal courts that the will of a person found to be possessed of sound mind and memory is not to be set aside on evidence tending to show only a possibility or suspicion of undue influence. The expressed intentions of the testator should not be thwarted without clear reason therefor."

We think this declaration is applicable to the facts of the present case. At most, there is a mere possibility or suspicion that undue influence may have been exerted by Mrs. Brooke. This is not enough. The testimony of the caveator to the effect that back in 1915 in the Philippines his sister told him in effect that he was disinherited, that she had seen to that, does not tend to establish undue influence. His sister had a right to state her reasons to her mother why her mother's property should not be left to a particular person and why it should be left to caveatee. Unless such statement was of a coercive character (and there is no evidence that it was), it did not tend to establish undue influence. Mackall v. Mackall,

135 U. S. 167, 10 S. Ct. 705, 34 L. Ed. 84; Beyer v. Le Fevre, 186 U. S. 114, 125, 22 S. Ct. 765, 46 L. Ed. 1080. Evidently the conversation with his sister in 1915 made a different impression upon the caveator at the time than that detailed in his testimony when he stated that he had no knowledge until after his mother's death "that a will had been made of this tenor." Moreover, during the 15 years which elapsed between the conversation and his mother's death he failed to mention the matter to her, although he had ample opportunity to do so.

For sixteen years this will reposed in the safety deposit box of the testatrix, from which at any time it might have been withdrawn by her. There were periods of time during which her daughter did not live in Washington when testatrix, had she so desired, might have changed her will without the knowledge of her daughter and uninfluenced by anyone, and yet she did not do so. Evidently the same considerations which led her in 1914 to make the will continued to exist during the sixteen years following.

It is said that testatrix entertained feelings of affection for caveator, and that, therefore, the provisions of the will are inconsistent. The fact that the affectionate attitude of the testatrix toward her son did not change following the making of the will indicates that in making it she was not actuated by an inspired prejudice toward him, but rather by a sense of obligation to her daughter and the conviction that the provision as to her son, in the circumstances, was justified. After all, the responsibility was hers, and in the absence of substantial evidence of undue influence, her wishes as expressed in her will should and will be respected.

It was error for the court below to deny caveatee's motion for a directed verdict.

Decree reversed, with costs.

Reversed.