**ALLEN INDUSTRIES, INC., and Colonial Rubber Works, Inc., Plaintiffs,**

v.

**NATIONAL SPONGE CUSHION, INC., Defendant.**

**Civ. No. 106–65.**

United States District Court
D. New Jersey.
July 12, 1967.

Backes & Backes, Robert M. Backes, Trenton, N. J., Harness, Dickey & Pierce, Don K. Harness, and Richard E. Dibner, Detroit, Mich., for plaintiffs.

Levy, Levy & Albert, Leon L. Levy, Trenton, N. J., Welsh & Cummins, Louis M. Welsh, San Diego, Cal., and C. G. Stratton, Los Angeles, Cal., California Bar, for defendant.

## OPINION

LANE, District Judge:

This case was instituted by Allen Industries as a declaratory judgment action seeking to have the four claims of National Sponge's Patent No. 2,740,739 declared invalid. National Sponge answered, asserting the validity of its patent claims, and counterclaimed, alleging that certain of Allen's products infringed its patent. Defendant's answer contained a demand that the case be tried by a jury. Subsequent to defendant's answer, Colonial Rubber Works, a wholly-owned subsidiary of Allen and the manufacturer of the products claimed to infringe defendant's patent, was granted leave to intervene as a party plaintiff.

██ This action was brought pursuant to 28 U.S.C. § 2201 with jurisdiction being based on 28 U.S.C. § 1338(a). Venue is proper since one of defendant's manufacturing plants is located in New Jersey. 28 U.S.C. § 1391(c).

Defendant was most insistent upon exercising its right to a jury trial. Con-

sequently, a jury was impaneled and the trial commenced on April 11, 1966. The trial continued until April 29, 1966, when the jury returned a verdict finding the four claims of defendant's Patent No. 2,740,739 valid and finding that four of plaintiffs' products infringed Claim One of said patent. By agreement of the parties, the damage issue was not submitted to the jury.

On May 9, 1966, plaintiffs filed in accordance with Rule 50 of the Federal Rules of Civil Procedure a motion for a judgment notwithstanding the verdict. The motion is properly before this court since plaintiffs' motion for a directed verdict made at the close of the presentation of evidence was denied. See, e. g., Beebe v. Highland Tank & Mfr. Co., 373 F.2d 886, 888 (3d Cir. 1967).

The parties in this case are engaged in the production and distribution of carpet underlay. Carpet underlay, as its name connotes, is a product which is placed under carpeting to increase cushionability and prevent slippage.

There are various types of carpet underlay and they differ greatly in terms of such things as feel under foot, durability, and ease of handling. Carpet underlay is produced from a variety of materials including jute, cattle hair, foam rubber, and sponge rubber. It can be either flat on both sides, flat on one side with embossments on the other, or waffled with bulges on both sides. Some carpet underlay has no reinforcing fabric while others have fabric backing. The fabric backings vary in terms of the closeness of the weave, the type of material, and the method of adhering the fabric to the underlay.

Allen Industries has been in the carpet underlay business for well over thirty years. In the early 1930's the only carpet underlay marketed by Allen was made of fiber materials such as cattle hair and jute. These products were somewhat modified in the middle 1930's by coating them with a latex spray in order to give them a greater degree of uniformity and cleanliness. Products such as these are still being produced and marketed by Allen, see P–216 and P–217.

In or about 1937 the first flat sponge rubber carpet underlay was introduced on the market. Shortly thereafter Allen was contacted by the U. S. Rubber Company and was shown some samples of a sponge rubber cushion product similar to P–91 which was flat on one side and had raised embossments on the other. This "waffled rubber sheet" sample had no fabric reinforcement on it. The individual primarily responsible for this product was Mr. Virgil H. Bodle who was employed at the time by U. S. Rubber. In 1938 Allen entered into an agreement with U. S. Rubber to purchase its entire output of waffled rubber sheets and to act as its marketing agent. Allen also marketed a U. S. Rubber product called Sentinel which was a flat non-skid pacer gripper material, see P–55, with a fabric reinforcement in the center similar to a present Allen product, P–206. These market arrangements were abbreviated in 1941 by the war conditions which made rubber for carpet use unavailable.

When rubber became available again after the war Allen started to manufacture its own rubberized type underlay under the name Rubber-Loc, P–215. The other major companies came out with flat sponge rubber products and the first waffled sponge rubber products were introduced. B. F. Goodrich introduced a waffled sponge without a fabric backing similar to P–21 in 1949 and then modified it by adding a paper backing in 1951. U. S. Rubber produced and sold a waffled sponge with a fabric backing, P–98, sometime around 1950 or 1951 (Tr. 146).

Defendant National Sponge first commercially produced a waffled sponge rubber product with a fabric backing, P–121, in the early part of 1952. This was shortly before Mr. Bodle, formerly of U. S. Rubber, joined National Sponge. National Sponge experimented with a waffled underlay through 1952, and in December filed its application for the patent in suit, No. 2,740,739. The patent claimed a product, P–35, similar to the

waffled sponge it was already producing, P–121, except that the fabric was to be applied without an adhesive.

In 1958 Allen Industries began to manufacture a flat foam rubber cushion and subsequently expanded its line to include a waffled foam rubber product. See P–210 and P–211. In the early 1960's Allen was producing a full line of carpet underlay products except for a sponge rubber series. Perhaps to fill this gap, Allen purchased the Colonial Rubber Works in Dyersburg, Tennessee, in 1962. At the time, Colonial was engaged primarily in the business of custom blending various kinds of sponge rubber. Shortly thereafter Mr. George R. Sprague, formerly of B. F. Goodrich, was hired, and in the spring of 1963 Colonial started to manufacture a line of waffled sponge rubber products. It is these products which are the accused products in defendant's counterclaim for infringement.

Application for the patent in suit was submitted on December 27, 1952, Serial No. 328,186, and the patent was issued on April 3, 1956. The named inventors were Messrs. Dixon R. Harwin, Alfred Stern, and Virgil H. Bodle; National Sponge Cushion Co. was named as assignee of the patent. The claims of Patent No. 2,740,739 are as follows:

1. A carpet underlay comprising a coarse-mesh fabric, and a sponge rubber facing on one side of said fabric and formed with bulges that are spaced from the fabric, said facing between the bulges, being in contact with the fabric and having a multiplicity of projections formed and forced by pressure from a blowing agent and extending into and through the interstices of the fabric.

2. A carpet underlay according to claim 1: the portions of said projections that extend through the interstices of the fabric being larger than said interstices to effect a key-locking engagement of the fabric and sponge rubber.

3. A carpet underlay comprising a coarse-mesh fabric, a sponge rubber facing on one side of said fabric and formed with bulges that are spaced from the fabric, said facing, between the bulges, being in contact with the fabric, a multiplicity of integral projections on the bulges and extending through the interstices of the fabric to bond the bulges of the facing and the fabric, the latter being generally flat.

4. In a carpet underlay according to claim 3: the projections being disposed along spaced parallel lines that are on a bias relative to the weave of the fabric.

Since a waffled type of sponge rubber with a fabric backing was sold in the United States more than one year prior to the date of defendant's patent application (Tr. 148, P–218), it is clear that the patent would not be valid merely as a claim for a waffled sponge rubber underlay with a mesh fabric backing. 35 U.S.C. § 102(b). However, the essence of the alleged invention is broader than the general components of the product claimed; it relates specifically to a method of bonding the woven fabric backing to a waffled sponge rubber.

The teaching of the patent is that bonding can be achieved without an adhesive by having the sponge rubber between the bulges expand through the openings in the weave of the fabric (interstices), such expansion being caused by blowing agents added to the uncured sponge rubber. Once the rubber is blown through the interstices of the fabric, the bond is caused by the outward push that the projections have on the fabric surrounding the openings (Claim 1), and by the key-locking engagements formed by the flattening out of some of the projections to form rivet-like heads larger than the interstices (Claim 2). Said projections are supposed to be formed on the facing between the bulges (Claims 1 and 2) and are also claimed to be on the bulges (Claim 3). Since the waffled bulges are on a bias relative to the weave of the fabric backing, the projections on the bulges (and presumably on the fac-

ing between the bulges) will also be on a bias relative to the weave of the fabric (Claim 4).

These claims can better be explained by reference to the Figures A to G. Figure A represents the apparatus for

FIGURE A

FIGURE B

FIGURE C

FIGURE D

FIGURE E

FIGURE F

FIGURE G

producing the product covered by the patent in suit. (This apparatus is claimed in Patent 2,703,909, issued on March 15, 1955, to National Sponge as assignee from Messrs. Harwin, Stern, and Bodle.) Figures B to D show the top side of the product with the fabric backing (8) and the projections (29) through the interstices. Figure E is a cross section of the waffled sponge showing the fabric backing (8) joined by means of projections (29). The bulges away from the fabric (30) and under facing (31) between the bulges are also shown. Figure F, which is an enlarged portion of the cross section, shows that the projections (29) are flattened out and are mushroomed around the adjacent threads (33). Figure G shows a bottom view of the finished waffled sponge rubber sheet with its bulges (30) and depressions (31).

The first step in the manufacture of the product in suit is to mix a blend of sponge rubber and to form it into a thin, flat sheet. This sheet of sponge rubber (6) leaves the blender and is fed onto a continuously moving link chain mold (5). The open weave fabric (8) is guided atop the rubber sheet by means of roller (7) and is then pressed against it by means of roller (9). Beneath the chain mold is a canvas apron (11) and above the chain, rubber, and fabric is an upper canvas apron (10). This five-ply sandwich is fed into a steamheated oven formed by two steel platens or chambers (27) with a fixed space between them. When subjected to the desired temperature a simultaneous blowing and vulcanization of the special sponge rubber mixture will occur. The temperature at which this occurs depends on the amount of blowing agents and accelerators added to the sponge rubber. As the mixture is heated the rubber will begin to expand and will sag downward (30) into the open channels (19) of the mold. The rubber sheet supported on the mold (31), however, cannot sag downward. Instead it will expand upward and be forced by the blowing agents against and through the mesh fabric, thereby forming projec-

tions (29). Some of the projections through the fabric will encounter the upper apron (10) and will be flattened out and mushroom around adjacent threads (33).

On this motion for a judgment notwithstanding the verdict, plaintiffs contend, *inter alia*, that the claims of Patent No. 2,740,739 are invalid. In support of this contention plaintiffs assert the following theories: (a) the invention claimed was anticipated by the prior art, 35 U.S.C.A. § 102(a); (b) the invention claimed had already been made by others in this country and had not been abandoned, 35 U.S.C. § 102(g); (c) the invention claimed does not meet the requirement of non-obviousness, 35 U.S.C. § 103; (d) the invention claimed was merely an assembly of old elements, Lincoln Engineering Co. of Illinois v. Stewart Warner Corp., 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008 (1938); (e) the invention claimed would inevitably be produced as a result of the process of Claim 8 of Patent No. 2,703,909 and therefore constitutes double patenting, Miller v. Eagle Mfg. Co., 151 U.S. 186, 14 S.Ct. 310, 38 L.Ed. 121 (1894); (f) the invention claimed is not sufficiently described in the specifications, 35 U.S.C. § 112.

In dealing with plaintiffs' motion this court is well aware of the delicate balance that must be maintained in the allocation of functions between the judge and the jury. The jury has determined that defendant's patent is valid, and we are now asked to enter a judgment declaring the patent invalid notwithstanding the jury verdict.

The ultimate question of patent validity is one of law. Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); Great A. & P. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 155, 71 S.Ct. 127, 95 L.Ed. 162 (1950). Over the years standards of invention have been established which must be met before a patent may be properly issued. Based on its understanding of the law, as charged, the jury in the instant case found that

the facts established that defendant's patent was properly issued. However, it is our belief that the jury's finding of patent validity is inconsistent with the established standards of invention. It is in such cases that it is appropriate to grant a judgment notwithstanding the verdict. Bentley v. Sunset House Dist. Corp., 359 F.2d 140 (9th Cir. 1966); Zilk v. Deaton Fountain Serv., 257 F. Supp. 458 (N.D.Cal.1966); see Packwood v. Briggs & Stratton Corp., 195 F.2d 971 (3d Cir.), cert. denied, 344 U.S. 844, 73 S.Ct. 61, 97 L.Ed. 657 (1952). Thus we feel compelled to exercise the responsibility delegated to us by Rule 50 of the Federal Rules of Civil Procedure and to hold as a matter of law that Patent No. 2,740,739 is invalid for failure to meet the test of non-obviousness.

The statutory requirement of non-obviousness is set forth in 35 U.S.C. § 103, which provides:

"*Conditions for patentability; nonobvious subject matter*

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

The statutory requirement was given extensive treatment in the recent case of Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), where it was interpreted in light of the constitutional command that the patent system must "promote the Progress of * * * useful Arts." The Court concluded that section 103 was merely a codification of a condition of patentability which had judicially evolved over the years. Although the Court clearly held that the statutory formulation did not change the strictness of the standards of obviousness, it did conclude that the inquiry should be "beamed with greater intensity." 383 U.S. at 19, 86 S.Ct. 684.

The test of non-obviousness involves a three-fold inquiry: (1) the scope and contents of the prior art at the time of the claimed invention must be ascertained; (2) the differences between the subject matter of the claimed invention and the prior art must be defined; and (3) it must be determined whether the differences defined would have been obvious at the time of the claimed invention to a person having ordinary skill in the art to which the subject matter pertains.

## 1. THE PRIOR ART

### B. F. Goodrich Prior Art

B. F. Goodrich's early experience in combining sponge rubber and fabric was in the production of the insole material for shoes. In the middle 1930's Goodrich started to produce a variety of carpet underlay products and still manufactures such products. Samples of some of the products manufactured in the 1940's were introduced into evidence as P–5, P–6, P–7, P–8, P–9, and P–12. For the most part these flat sponge rubber products with fabric backing were produced by passing a layer of uncured sponge rubber with a fabric on top of it through heated stationary platens as shown in P–1, a diagram of the sheeting machine. When the uncured rubber sheet was heated the blowing agents in the rubber caused it to expand and push the fabric against the top platen. The blowing continued in this confined space and as a result of the blowing and the pressure, the sponge rubber passed into or through the interstices of the fabric. It thus formed a bond with the fabric without the use of adhesives. (Tr. 278–79.) The types of backings used varied in closeness of weave and also in composition of fabric, but blow-through was experienced with cottonette, burlap, and duck.

During the period 1949–1952 various experiments concerning adjusting the composition of the sponge rubber were conducted. See P–123, P–124, P–125, P–127, P–128, P–129. In these experiments the amount and type of accelerators and the amount of sulphur were changed. Goodrich had known since the early 1930's that it could vary its product by varying its composition. (Tr. 371.)

Mr. Lester Pannone, who was employed by B. F. Goodrich for 43 years and did much work with sponge rubber, testified that he first saw a waffled sponge rubber product in 1947 (the U. S. Rubber product, P–98), and shortly thereafter was able to reproduce it in his laboratory. Various experimentations on waffled sponge were continued throughout 1948 and it was first commercially sold by B. F. Goodrich in 1949.

This commercial waffled sponge product, P–21, had no fabric or other backing. Complaints were received because it was found that the product would stretch and tear when a carpet was dragged across it. To strengthen the product and decrease the friction, a paper backing was put on the product in 1950 or 1951. This product was not entirely satisfactory either, because there was a rustle as people would walk on it.

In 1951 experimentation with a fabric backing was conducted and it is claimed that a successful product was produced, as reflected in document P–28. Pannone testified that adherence was achieved in the product by the rubber being blown through the interstices of the fabric and that he observed a mushrooming of the projections (Tr. 345–46). According to Pannone, the problem was one of limiting the blow-through rather than achieving it (Tr. 456).

The laboratory worksheet accompanying the experimentation with adhering a fabric backing to the waffled sheet, P–28, states that, "Waffle with cottonette 1 or 2 sides can be made—extra cost not justified at present." In fact, such a product was not commercially marketed by B. F. Goodrich until 1954 and was not really perfected until 1955 or 1956 when latex was added to the backing and some of the blow-through was eliminated, see P–30 and P–31.

*U. S. Rubber Prior Art*

U. S. Rubber first combined fabric and sponge rubber in the early 1930's for use as a shoe insole material, both with and without the use of adhesives. In the late 1930's they produced a carpet underlay which was composed of an embossed rubber sheet with a cemented fabric backing. See P–91 and P–62.

After the war U. S. Rubber expanded its carpet underlay line and produced several flat sponge rubber products with burlap backings, P–93 and P–94. These products and others, e. g., P–59 and P–60, were made in a double platen press, see P–102, and adherence was achieved without adhesives by having the sponge rubber blow and force the fabric against the top platen. Blow-through was observed and the testimony is that it was usual for the pressure of the blowing agents to force sponge rubber through the backing except for backings which had no openings (Tr. 655). Adherence was also attributed to the natural tackiness of the raw sponge rubber.

The testimony is that the end-result product could be varied by changing the chemical composition of the sponge rubber. This, in turn, would affect the amount of blowing of the rubber (Tr. 651). The importance of changing the composition of the sponge rubber was known at U. S. Rubber prior to World War II (Tr. 629).

U. S. Rubber first experimented with a waffled sponge in 1945 and 1946 and started to commercially produce waffled sponge with a fabric backing in 1948. This product, P–50 or P–98, was made in two steps first by curing, blowing, and shaping the sponge rubber and then by laying a latex (cement) coated fabric on top of the cured rubber and placing the two on a drying drum. (Tr. 584.)

The testimony is that prior to 1950, U. S. Rubber also produced a waffled

sponge rubber with fabric backing without the use of adhesives. This was done in three different ways: (1) by calendering the rubber and sponge together; (2) by roll-pressing the fabric onto the sponge; or (3) by laying the fabric on the rubber. The product was then put into the platen press where it was blown and cured. The relation between fabric and rubber in the finished product was that a rubber had been pushed into and in some cases through the interstices of the fabric. (Tr. 590.) U. S. Rubber did not commercially produce a waffled sponge with a mesh fabric backing secured without use of adhesive or calendering prior to 1954 (Tr. 590), although some of the evidence indicates that they were actively seeking such a product, D–EEE.

### National Sponge Prior Art

At the time that Mr. Bodle joined National Sponge in the spring of 1952, National Sponge was already commercially producing and selling a waffled sponge rubber carpet underlay with a mesh fabric backing, P–121. Bonding of the fabric to the waffled sponge was achieved in that product by use of an adhesive.

Mr. Harwin, the president of National Sponge and a listed co-inventor of the patent in suit, described how the early product, P–121, was manufactured. The machine used to produce that product was similar to that used in the patent in suit and its main difference was that it had a means of applying an adhesive to the fabric.

Harwin's testimony is that whereas P–121 had the fabric adhered by use of adhesives, adherence was achieved in the product made in accordance with the patent in suit, P–35, by chemical and mechanical blowing of the sponge rubber into and through the interstices of the fabric. (Tr. 953–54). Mr. Harwin did testify, however, that projections were observed in isolated areas of the early product, P–121. (Tr. 919.)

### Prior Art Patents Not Cited by the Patent Office

(a) Jean Pennel and Joseph Flipo, "Sponge Rubber Coated Fabric and Method of Manufacturing the Same," No. 2,163,289, issued June 20, 1939. This patent teaches simultaneous blowing (called swelling) and vulcanization by coordinating the time of the vulcanization process with the blowing process through use of accelerators. It also teaches the adhesion of a fabric and sponge rubber without an adhesive by calendering the fabric into the raw sponge mixture (i. e., rolling the two through a device similar to the wringers of a washing machine), and then heating the combination and allowing it to blow and vulcanize. The method is free blow since the combination is not confined in a mold. The patent also teaches the manufacture of a product in a continuous process.

(b) Thomas Roth and Theodore Hinchcliffe, "Method of Making Floor Coverings, Table Coverings, and the Like," No. 2,217,137, issued October 8, 1940. This patent teaches a method of uniting sponge rubber to a fabric, including mesh fabric, without the use of an intermediate adhesive material. This product is made in a restricted mold by placing an uncured sponge rubber mixture on top of a fabric. The closed mold is subjected to heat and "the internal pressure of the expanding rubber forces the rubber into the pores of the fabric * * * thereby causing an inseparable union of the fabric and the rubber sheet." This product is not made continuously and is not free blown. Dr. Colburn stated that projections would be inevitable in this product.

(c) Edward Seward and William Seward, "Apparatus and Method for Manufacturing Rugs and the Like," No. 2,240,-581, issued May 6, 1941. This patent teaches that sponge rubber and woven fabric can be united without an adhesive by vulcanization in an enclosed mold subject to heat. As the rubber is heated it expands and forces the fabric against

the upper member of the mold. Dr. Colburn stated that projections through the interstices of the fabric would be formed. This is a non-continuous process.

(d) George Blair and Virgil Bodle, "Carpet Underlay or the Like and Method of Making Same," No. 2,339,142, issued January 11, 1944. This patent teaches that sponge rubber can be calendered into a woven fabric with the rubber being pressed into the interstices of the fabric on one or both sides. The combination is then passed through an oven where it is heated which causes it to blow and vulcanize resulting in free-blown bulge formations or protuberances through the interstices.

(e) George Blair and Virgil Bodle, "Method of Making Laminated Cushion Material," No. 2,480,316, issued August 30, 1949. Although the patent teaches a method of combining an open-weave fabric and an inexpensive non-cellular stock, it also contemplates the use of sponge rubber. This process involves feeding a sheet of rubber into a circular forming apparatus which heats and molds the rubber into an embossed sheet with opensided hollow ribs. A continuous sheet may be formed and the fabric can either be vulcanized directly to the rubber in the same process or can be adhered separately in a second step by use of an adhesive. The fabric in either case is applied only to the top of the raised embossments (i. e., it straddles the valleys between the adjoining hollow ribs). Although the patent says nothing about blowing or projections, Dr. Colburn stated that the formation of projections through the interstices of the fabric is implicit in the process. These projections in turn would be flattened out by contact with the belt surrounding the circular molding apparatus.

*Prior Art Patents Cited by the Patent Office*

(a) William Binns, "Method of Making Rubber Cushion Material," No. 2,-271,058, issued January 27, 1942. This patent teaches a means of combining latex foam rubber with a fabric by pouring the latex onto a surface which has curved projections and which has fabric conforming thereto. This combination is heated and vulcanizes and coagulates, forming a product with air pockets. The fabric conforming to the air pockets is adhered without a cement and this product can be produced in a continuous process.

(b) George Blair and Virgil Bodle, "Method of Making Sponge Rubber Material," No. 2,325,903, issued August 3, 1943. This patent teaches a method of producing a free-blow, solid, sponge rubber sheet with a raised waffle design. This is done by pre-forming the uncured sponge by use of a calender roller which imparts a design onto the raw rubber. The raw rubber with raised embossments is then fed into a heated atmosphere where it is blown and vulcanized. Since this product is not confined in a mold, it can be made in a continuous process. The patent also states that a fabric backing can be applied to the flat side of the fabric by use of an adhesive.

(c) John Reese, "Skin Graft Receiving Member," No. 2,583,341, issued January 22, 1952. This patent teaches that rubber rivets extending through the interstices of a fabric can be used as a method of mechanically uniting the fabric to the sponge rubber sheet. A portion of the rubber is forced into the interstices of the fabric by calendering them together, and, thus, the rivets are integral with the rubber sheets. The calendered sheet is then vulcanized.

(d) Sterling Alderfer, "Fabric Coated Sponge Rubber and Method of Making Same," No. 2,648,619, issued August 11, 1953. This patent teaches the adhesion of rubber to a fabric without the use of an adhesive by causing the rubber to be embedded in the interstices of the fabric. The specifications talk in terms of a foamed latex rubber but it is also stated that sponge rubber can be used.

## 2. THE ADVANCEMENT MADE BY THE PATENT IN SUIT

The advancement made by the patent in suit over the prior art is a method of

*attaching a coarse mesh fabric backing to a waffled sponge rubber sheet without the use of an adhesive.* (Tr. 233, 959, 1317.) According to the testimony of the three men who claim to be co-inventors of No. 2,740,739—Messrs. Bodle, Harwin, and Stern—the product was primarily a result of their joint efforts.

Mr. Harwin testified and offered documentary proof which showed that at the time Mr. Bodle joined the staff at National Sponge in April of 1952, National Sponge was already commercially producing P–121, a waffled sponge rubber carpet underlay with a coarse mesh fabric backing. (Tr. 949, 1471, 1485.)

Mr. Bodle testified that the product covered by the patent in suit, P–35, was developed during the summer of 1952 as a result of an effort to improve the National Sponge waffle underlay P–121. After stating that P–121 was not an acceptable product, Mr. Bodle explained what was wrong with it and how the improvements thereon resulted in the new product claimed by the patent in suit:

A [Mr. Bodle] * * * The adhesion of the fabric that they were using was not good enough.

Q [Mr. Harness] You mean the adhesion of the fabric to the sponge rubber?

A Yes. The sponge was not even across. It had humps in it and unevenness. I might add that you have to make a product that when you cut it to put it around under your carpet, you can't have different thicknesses, and the product was uneven. The adhesion was bad. It just wasn't a successful and commercial product.

Q What changes did you make in that material or the method of manufacturing to come up with the product referred to in the patent in suit?

A Well, jointly three of us, Mr. Harwin and Stern and myself took this problem and started to work on it earnestly and in a way that we would make a product that was acceptable. Because of my previous experience, I knew that a rubber carpet underlay was a wanted product in this country.

Q What did you do specifically, Mr. Bodle?

A Well, between the three of us, the first trial that was made after I came with them, the fabric or scrim was being cemented at the far end of this 16-foot press and then the fabric was brought back to the starting end or this right-hand side.

Q You mean brought back here before it got to the oven over on this side?

A Brought back to the righthand side of the oven and combined with the sponge or laid on the sponge and as I said before, the product was uneven, bad adhesion, hard spots, and it was just not an acceptable product so—

Q Yes, but what—excuse me. Go ahead.

A So we went to work on the adjustments of the machine.

Q Let's take the adjustments of the machine. Specifically tell me what adjustments did you make in the old machine to make the products shown in the '739 patent in suit?

A We changed the method of raising and lowering the oven.

Q You mean raising and lowering this top platen?

A The top and the bottom, that is the separation of those two heated chambers.

Q What did you change them from, what to what?

A As I recall, they had jacks, similar to an automobile jack, and we put screw adjustments, bolts, so to speak, so they could be worked with a wrench. We changed the heating so that we could vary the heat.

Q By varying the heat you mean the heat along the length of this oven press?

A Yes.

Q How did you make that change? What did you do to be able to vary the heat where you couldn't before?

A Put in heating, we lengthened the press and put in some extensions on the front and the back in order to get to

vary the heat because the 16-foot press was not made so that you could change the heat. It was all one cavity, so we put steam chamber in the front and the back, as I recall now so that we could change the heat, and then we started, and we eliminated the cement from the fabric, and we changed the design or the kind of fabric that they were using or that they had when I came with them.

Q   What did you change, from what kind of fabric to what kind to make the successful product?

A   Well, we were using, they were using a, I call it sleazy, limp fabric that was, I don't see any—

Q   Something like cheesecloth, limp like cheesecloth?

A   Yes, in a measure, yes, and we changed it to a square woven fabric. * * *

Q   * * * On this new fabric, the square woven fabric which you said you changed to to get the successful product referred to in your patent in suit, was that fabric, when you got it from the fabric manufacturer, coated with a latex rubber?

A   I was told after I got acquainted with the manufacturers of this fabric, which happened to be the Fulton Bag Company in Atlanta, Georgia, I was told, or while we were working perfecting a fabric, that they were using some of this liquid rubber latex in the sizing, in the sizing in fabric. Almost all fabric, your dresses and suits and mine, has a stiffening agent, has something in it to give it a hand.

Q   Starch is a typical sizing, isn't it?

A   Starch.

Q   Yes.

A   And they were using some latex in their starch to make their starch work better.

Q   Well, they were using—the answer to my question is there was, to the best of your knowledge, liquid latex, rubber latex applied to the fabric by the fabric manufacturer, is that correct?

A   That's right.

Q   All right. So now you have said the changes you made were you eliminated the use of jacks on the oven, these big heavy cast iron oven jacks and put in a screw arrangement so you could adjust the spacing between. That was one change. I believe you said another change. I believe you said another change that you made was you arranged the oven so you could vary the steam pressure in the different parts of the oven?

A   That is right.

Q   Then you changed the fabric from a limp fabric to a stiffer square woven fabric, and you eliminated the putting of the fabric through a cement bath?

A   That is right. * * *

Q   What was it, Mr. Bodle, that enabled you with this new product, which you say you developed in 1952, to eliminate the need for the cement on the fabric which had been in the earlier National Sponge product?

A   My experience, other than the mechanical changes that the three of us worked out, my previous experience in those 30-some years before was to use certain amounts of sulfur and accelerator, that is the things that makes rubber cure, vulcanize, and I conceived the idea of using a greater amount to get vulcanization and sponging in a better method and to get the sponge to blow up and through and into, and sometimes through the interstices of the fabric. And so I used a greater amount of accelerator and sulfur than any experience that I had or knew anything about.

Q   So it was the increase in the amount of sulfur and accelerator in the new compound which enabled you to adhere the fabric to the rubber without passing the fabric through a cement, is that correct?

A   It is correct, together with other techniques of compounding that I can't recall right now.

Q   You don't recall the other techniques?

A    Softening the rubber probably had something to do with it, the processing of it.

Q    What do you mean by the processing of it?

A    Natural rubber that comes out of the tree is a hard, horny mass.  I mean it comes out of the tree a liquid, about like maple syrup.  It is just like the syrup comes out of a maple tree.  And it contains about 40 to 45% water and that water is evaporated off, where the rubber is raised, and most of the rubber is raised in the Far East, near the equator, where the fighting is now going on.  And when we get the rubber in bales, I am talking about natural rubber from the rubber tree, when we get the rubber it is a horny, hard mass and it requires processing, it requires squeezing, it requires what we call masticating to get it into a dough and to a shape so that you can make this noodle that I was talking about.

And so we changed the compound of the rubber, softened it, together with putting ingredients in it to make it sponge up and through the fabric.

As a result of the above-described changes in the machinery, fabric, and rubber compound, National Sponge was able to produce a product without the use of an adhesive to bond the waffled sponge rubber to the fabric backing. Instead, bonding was achieved by having the sponge rubber blow into and in some cases through the interstices of the fabric.  The portion of the rubber extending through the fabric was flattened out forming a rivet or mushroom head and effecting a key-locking engagement. Thus, National Sponge was able to produce its carpet underlay P–35 in a one-step process.  In that process, not only is the waffle design imparted to the sponge rubber, but, in addition, the chemical reaction resulting in the simultaneous blowing and vulcanization of the sponge rubber is utilized to effect a bonding of the fabric backing to the waffled sponge rubber.

The process has enabled National Sponge to reduce its production costs and the resulting product has met with much commercial success.

3.  OBVIOUSNESS OF THE AD-VANCEMENT OVER THE PRIOR ART

The prior art reveals that at the time of the invention in suit there was nothing new about a carpet underlay product composed of a waffled sponge rubber sheet with an attached woven mesh fabric.  U. S. Rubber was producing such a product, P–98, as was National Sponge, P–121.  However, in those products attachment of the fabric to the sponge rubber was achieved by means of an adhesive.

At the time of the invention in issue, it was common practice to adhere fabric backings to *flat* sponge rubber sheets without the use of adhesive.  In some of these flat products, adherence was accomplished by calendering the rubber and the fabric together and thus embedding the fabric into the uncured rubber.  See Pennel, No. 2,163,289, P–6, P–9, P–93.  In our view, the nature of bonding achieved by forcing the fabric into the sponge rubber is not greatly different from having the rubber force itself into the fabric.  Although there was some blow-through in these products, it is difficult to separate the effects of the blow-through from the effects of the calendering because blow-through was restricted by the top platen of the machine.  However, where such products are allowed to free blow, the combined effect of calendering and the blowing can be seen.  See Blair No. 2,339,142.

Adherence between sponge rubber and fabric has also been achieved without adhesives in flat products without calendering.  This is done by having the rubber blow under pressure into the interstices of the fabric, while the fabric and the rubber are restricted in a confined mold.  See Seward, No. 2,240,581; Roth No. 2,217,137.  Other methods have also been used to force the rubber into

the interstices of the fabric and thus accomplish bonding without calendering and without the use of an adhesive. See Alderfer, No. 2,648,619.

At the time of the invention in suit not only was it known that bonding between a fabric and a flat rubber could be achieved without adhesives by having the rubber extend into the interstices of the fabric but it was also known that bonding could be achieved by having the rubber extend into *and through* the interstices—forming rivet-like projections very similar to the key-locking principle claimed by the patent in suit. See Reese, No. 2,583,341.

In addition to these flat sponge rubber products, it was also known in the prior art that a woven fabric could be vulcanized to a corrugated rubber sheet. See Blair, No. 2,480,316. Although no mention is made in the patent of projections coming through the interstices of the fabric, plaintiffs' expert, Dr. Colburn, testified that the sponge rubber would blow through the interstices of the fabric and be flattened out by the outside belt (Tr. 1147–48) and that projection would be implicit (Tr. 1311). In addition, the waffled product referred to in B. F. Goodrich laboratory worksheet, P–28, is claimed to be adhered to a fabric backing by rubber being blown through the interstices of the fabric.

If the expert testimony relating to Blair, No. 2,480,316, and the recollection of the Goodrich people concerning the product are correct, it can be strongly argued that the patent in suit had been completely anticipated. However, we do not rely on this evidence as establishing anticipation. Nor do we, in our view of the case, find it necessary to rely on this evidence as part of the prior art against which the advancement made by the patent in suit must be evaluated.

A review of the relevant prior art leads us to the conclusion that the means employed by the patent in suit to adhere the fabric backing to the *waffled* sponge is essentially the same as had been used to adhere fabric to *flat* sponge. The question thus presented is whether the difference between the problems encountered when using a waffled sponge and those presented in the use of flat sponge is so great that the invention in issue would not have been obvious to one having ordinary skill in the art.

There is testimony to the effect that a waffled sponge rubber product could not be calendered to a fabric because this would interfere with the formation of the bulges (Tr. 257). However, much of the prior art did not require calendering.

Mr. Pannone testified on cross examination that the problems of adhering fabric to waffled sponge are different from those involved in adhering it to flat sponge (Tr. 384). However, on redirect Pannone testified that the method of applying fabric to sponge rubber, flat or waffled, is the same. (Tr. 457–60.)

Dr. Colburn, plaintiffs' expert, testified that the only difference between obtaining a bond using waffled sponge rubber and an open weave fabric as compared with flat sponge rubber, is that the area of contact between the fabric and the waffled sponge would be less than in the case of flat sponge. But, in the area where there is contact, he stated that the fabric and the rubber would behave the same way for both the flat and the waffled sponge rubber. (Tr. 1174, 1178–79.) Dr. Colburn based his conclusion on an experiment which he conducted in which he produced flat and waffled sponge rubber simultaneously in the same operation, P–269 and P–270. (Tr. 1174–78.)

The evidence convinces us that the problems of adhering a fabric to a waffled sponge are not significantly different from those which had been experienced in the use of flat sponge. Thus, it is our conclusion that the advancement made by the patent in suit over the prior art would have been obvious to a person of ordinary skill in the art. Consequently we hold that the four claims of Patent No. 2,740,739 are invalid as a matter of law.

518

While it is true that defendant has presented evidence on such secondary considerations as commercial success, unsolved need, failure of others, and licensing agreements which are relevant indicia of non-obviousness, see Graham v. John Deere Co., supra 383 U.S. at 17–18, 86 S.Ct. 684, these factors cannot establish invention where obviousness is otherwise clear. Walker v. General Motors Corp., 362 F.2d 56, 60 (9th Cir. 1966) and cases cited therein.

The above disposition makes it unnecessary for us to pass on the other issues raised on this motion. A form of order is to be submitted.