See also D.C., 277 F.Supp. 1011.

Patricia Meryl **GATENBY** and Percy Evans, Administrators of the Estate of Ian Alexander Gatenby, Deceased

and

May Thora Mole, Executrix of the Estate of John Henry Mole, Deceased

v.

**ALTOONA AVIATION CORPORATION** and Paul Peterson, Altoona Aviation Corporation, Appellants.

No. 17186.

United States Court of Appeals Third Circuit.

Argued Oct. 7, 1968.

Decided Dec. 19, 1968.

As amended April 2, 1969.

James F. Manley, Burns, Manley & Little, Pittsburgh, Pa. (Louis R. Dadowski, Pittsburgh, Pa., on the brief), for appellants.

David Rein, Forer & Rein, Washington, D. C. (Joseph Forer, Washington, D. C., Hymen Schlesinger, Pittsburgh, Pa., on the brief), for appellees.

Before McLAUGHLIN, STALEY and VAN DUSEN, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

This is a case, arising under Federal diversity jurisdiction, where an airplane in which the plaintiffs' decedents[1] were passengers crashed and all persons were killed.

On December 8, 1963, at 1:00 P.M., Mark Riguette, the pilot of a single engine air charter plane, owned and operated by the defendants, took off from Peterson Field[2] to pick up two passengers at Washington, D. C., National Airport. While en route to Washington, he received a weather briefing from the Phillipsburg flight service station[3] indicating that a cold front was moving from Eastern Ohio into Western Pennsylvania. At approximately 2:55 P.M., the plane landed at the Washington National Airport, picked up the passengers, and departed for University Park Airport at State College, Pennsylvania. Although the pilot obtained no weather briefing before leaving Washington, he contacted the pilot-to-forecaster service at 3:12 P.M. while over Frederick, Maryland. The service informed him that there was an indefinite ceiling of 1200 feet at Phillipsburg, with visibility of two miles; that there would be moderate icing and turbo-severe turbulence along his route; and that the front would lower the ceiling to 1000 feet and visibility to one or 1½ miles. The forecasting service did not expect the front to reach Phillipsburg for another two or three hours. At 3:17 P.M., shortly after the communications between Frederick and the pilot were concluded, the forecasting service altered its prediction. According to the new forecast, it was expected that the ceiling would drop to 500 feet and visibility would be limited to one-half mile. The revised forecast was repeated by all weather stations along Riguette's route at 3:45 P.M. and was available to him upon request at any time after 3:17 P.M.

The pilot did not land at University Park as planned, but radioed Peterson Field at 3:50 P.M., reported that he was over Port Matilda,[4] and advised that he would land at Peterson. By the individual co-defendant's own admission

1. At the time of their deaths, the plaintiffs' decedents, Gatenby and Mole, were British subjects, employed by the British Admiralty as research scientists, working on a classified project.

2. Peterson Field is an airport located on the main highway between Altoona and Tyrone, Pennsylvania, approximately 10 miles northeast of Altoona.

3. The Phillipsburg flight service station is located about 23 miles northwest of Peterson Field and is the closest weather reporting station thereto.

4. Port Matilda is 12 miles due west of University Park, while Peterson Field is southwest (226°) of University Park.

(he was the only witness called by defendants who testified to any of the conditions surrounding the accident), the ceiling at Peterson was then only 800 to 1000 feet. At 3:59 P.M., the plane crashed into Bald Eagle Mountain [5] while in a level flight cruise condition, heading due west during a heavy snowstorm. The pilot and both passengers were killed in the crash.

Altoona Aviation Corporation appeals from a judgment for plaintiffs entered on December 7, 1967, after judgment n. o. v. had been entered for plaintiffs on the liability issues following a jury verdict at the first trial in defendants' favor, which was followed by a second jury trial limited to the damage issues.[6]

Since substantially all of the plaintiff's evidence was adduced by testimony, the appellant claims that the District Court was precluded from entering a judgment n. o. v. by the Pennsylvania oral evidence rule,[7] which provides, according to appellant, that it is the province of the jury in trespass cases, where oral testimony is concerned, to pass upon the credibility of witnesses, even though uncontradicted by defendant's witnesses or even though defendant introduces no testimony at all. We find it unnecessary to determine the extent of this Pennsylvania rule or its application to the situation presented in the case now before the court.

Irrespective of the applicability of the above Pennsylvania oral evidence rule, which cannot be determined with certainty by a federal court in view of the language in the Pennsylvania cases, the federal decisions make clear that, insofar as this rule attempts to define when the jury must decide, as its function, whether the particular elements of liability exist, it would be operating in a field reserved for federal law. See Lind v. Schenley Industries, Inc., 278 F.2d 79, 84 (3rd Cir.), cert. den. 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960); Denneny v. Siegel et al., 407 F. 2d 433, (3rd Cir. 1969), and cases there cited. Where the party having the burden of proof produces evidence which establishes the facts in his favor so clearly that reasonable men could have no doubt, he is entitled to a verdict directed in his favor. Byrd v. Blue Ridge Cooperative, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958); Herron v. Southern Pacific Company, 283 U.S. 91, 51 S.Ct. 383, 75 L.Ed. 857 (1931).[8] Therefore, the standard against which judgment n. o. v. must be tested is the standard contained in Mihalchak v. American Dredging Company, 266 F.2d 875, 877 (3rd Cir. 1959), where we said:

"The question raised by plaintiff's motion * * * then, is whether he had so well succeeded in carrying his burden of producing evidence that he

---

5. Bald Eagle Mountain is about 10 miles southwest of Phillipsburg and 15 miles northeast of Peterson Field, and is due west of University Park. The plane crashed at an altitude of 2600 feet, 150 feet below the summit of the mountain.

6. The opinion of the District Court is reported at 268 F.Supp. 599 (W.D.Pa. 1967), where it is made clear at 602 that plaintiff's motion for a directed verdict made at the close of the evidence was denied and plaintiff moved for judgment n.o.v. as provided by F.R.Civ.P. 50(b).

7. See discussion of this rule and Pennsylvania appellate court decisions at pages 602–605 (268 F.Supp.) of the District Court opinion cited in footnote 6.

8. Summary judgment in favor of plaintiff has been granted on facts similar to those in this record and such action approved by the Court of Appeals for the District of Columbia. See American Airlines v. Ulen, 87 U.S.App.D.C. 307, 186 F.2d 529 (1949).

The power of a federal judge to grant a directed verdict for either party has been consistently recognized. See Leach v. Burr, 188 U.S. 510, 513, 23 S.Ct. 393, 47 L.Ed. 567 (1903); Galloway v. United States, 319 U.S. 372, 389, 63 S.Ct. 1077, 87 L.Ed. 1458 (1943); Allen Industries, Inc. v. National Sponge Cushion, Inc., 292 F.Supp. 504 (D.N.J.1967), aff'd. 403 F.2d 717 (3rd Cir. 1968), cert. den., 394 U.S. 920, 89 S.Ct. 1194, 22 L.Ed.2d 453 (1969); cf. Ex Parte Petersen, 253 U.S. 300, 309–310, 40 S.Ct. 543, 64 L.Ed. 919 (1920).

was entitled to a verdict in his favor as a matter of law.

"The propriety of directing a verdict in appropriate situations in favor of the party imposed initially with the risk of non-production of evidence seems to be well settled. Yet though a motion * * * in favor of the proponent of an issue is cast in the same form as when made by the defending party, it requires the judge to test the body of evidence not for its insufficiency to support a finding, but rather for its overwhelming effect. He must be able to say not only that there is sufficient evidence to support the finding, even though other evidence could support as well a contrary finding, but additionally that there is insufficient evidence for permitting any different finding. The ultimate conclusion that there is no genuine issue of fact depends not on a failure to prove at least enough so that the controverted fact can be inferred, but rather depends on making impossible any other equally strong inferences once the fact in issue is at least inferable."

On the basis of that standard, we hold that the trial court committed no error in granting judgment n. o. v., since, on this record, the pilot of the ill-fated plane was negligent as a matter of law.

The substantive law of Pennsylvania, which we are bound to follow,[9]

holds that a common carrier owes its passengers the duty of exercising the highest degree of care. Griffith v. United Airlines, 416 Pa. 1, 203 A.2d 796 (1964). This duty is violated by negligence *per se* which arises from the violation of a governmental safety regulation. Jinks v. Currie, 324 Pa. 532, 188 A. 356 (1936); Gaskill v. Melella, 144 Pa.Super. 78, 18 A.2d 455 (1941). As the pilot of a single engine aircraft, Riguette was required to fly according to FAA visual flight regulations (VFR). Reasonable men could come to no other conclusion on this record but that certain visual flight regulations were violated. The appellant is, of course, liable for any injuries which were proximately caused by this negligence *per se*. Ennis v. Atkins, 354 Pa. 165, 47 A.2d 217 (1946).[10] The following uncontroverted facts show violation of at least these enumerated regulations:

(1) The plane was in a level flight cruise condition at the time it struck the mountain. The only reasonable inferences which may be drawn therefrom are that (a) the pilot was not watching where he was going, or (b) he could not see where he was going, or (c) he was simply flying the plane below VFR minimum altitude requirements.[11] Any one of these inferences can lead only to the conclusion that the pilot was violating VFR safety requirements, the design of which is to prevent air disasters. When flying VFR, the pilot may not rely on instru-

---

9. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

10. Each of the acts of negligence discussed under 1–3 below constitutes a proximate cause of the accident. As the trial court stated:

"Whether or not this pilot was off course because of lack of visibility or because he was attempting illegally to operate by instrument, whether or not he was misled by 'magnetic variations' in the area, or a sudden snow storm, he was not flying at the prescribed altitude in mountainous terrain which he knew well. His failure to fly 1,000 feet from any mountain caused him to crash into that mountain * * *.

We think that only one reasonable, rational conclusion can follow, that the violation of the altitude regulation was the legal cause of the crash and consequent damages."

11. "42.53. *Minimum in flight altitude rules:* Except during take off and landing, the flight altitude rules described in paragraphs (a) and (b) of this subsection * * * shall govern air carrier operations * * *.

"(a) *Day VFR operations.* No aircraft shall be flown at an altitude less than 500 feet above the surface or less than 1,000 feet from any mountain, hill, or other obstruction to flight * * *."

ments, he must watch where he is going; if he fails to watch, he is negligent *per se,* and, similarly, if weather conditions obstruct his view, he should leave the area and proceed to a location where he can see.[12]

(2) By flying the aircraft into an area where the ceiling was below 1000 feet and visibility was less than one mile,[13] the pilot violated minimum weather requirements[14] of the FAA pertaining to VFR flights.

(3) Appellant's allegation that the pilot flew into the side of the mountain because his compass may have been affected by magnetic variations in the area only serves to reinforce the appellees' case. If the crash was caused by an inaccurate compass, the only inference which could be drawn is that the pilot was actually relying on the compass, not on his vision. Such reliance on the compass is a violation of Rule 42.16, which requires instrument flights to be made only in multi-engine planes with a co-pilot. If the pilot was relying on the compass, rather than looking out of the window, he was attempting a prohibited instrument flight since he was flying a single engine plane absent a co-pilot.

In addition to the negligence *per se* arising from violation of FAA regulations, the carrier violated its duty of highest care owed the passengers in other ways. Griffith v. United Airlines, supra. The pilot knew from the weather reports from Phillipsburg and Frederick, and could see, that he was flying into a rapidly deteriorating weather condition marked by substandard visibility, yet he neither kept abreast of weather reports after passing Frederick nor did he turn back when those conditions must have been apparent to him. Failure to pursue either course was a violation of the duty owed. The pilot's negligence in flying into an area where below minimum weather conditions existed, and his failure to either maintain any lookout, or his failure to act reasonably with regard to known weather hazards, were proximate causes of the accident.

Having decided that the trial court did not err in granting judgment n. o. v., the question of its alternative grant of a new trial is moot. We have considered the appellant's other contentions and find that they are without merit.[15]

For the foregoing reasons, the judgment of the District Court will be affirmed.

12. The record indicates that east and south of Port Matilda there was visibility. One witness, the defendant Peterson, described the ceiling as being between 800 and 1000 feet at Peterson Field. Several other witnesses, residents of the immediate area of the crash, described very heavy snow and little or no ceiling whatsoever.

13. Mr. Peterson testified that visibility at Peterson Field was 7 or 8 miles, while the residents of the crash area testified that visibility was no more than 200 yards in heavy snow.

14. "42.55. *Weather Minimums.* No flight shall be started unless the takeoff, en route operation, and landing at destination can be conducted in accordance with weather requirements of part 60 of this subchapter, but in no case less than the minimums specified below.
"(a) For VFR takeoff, en route operation, or landing the weather minimums shall be a ceiling of 1,000 feet and visibility of 1 mile for day * * *."

15. The expert testimony on present worth, together with the explanation in the charge were sufficient to answer the requests for a supplemental charge on the computation of damages under the Wrongful Death and Survival Acts.